SCHAGUN v. SCOTT MFG. CO.*

(Circuit Court of Appeals, Eighth Circuit. April 17, 1908.)

No. 2,689.

1. ACCORD AND SATISFACTION—RIGHT OF ACTION FOR FRAUD AND DECEIT.

Where a purchaser of a machine, after using it for a time, resold it to the seller at an agreed price exceeding that which he paid, to be credited upon the purchase price of a new machine, the transaction operated as an accord and satisfaction of any claim for damages he may have had for fraud and deceit in its sale.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 1, Accord and Satisfaction, §§ 98–110.]

2. FRAUD—GROUNDS OF ACTION—INTENT TO DEFRAUD—BURDEN OF PROOF.

In an action for fraud and deceit, the burden rests on the plaintiff to prove that the representations relied on were of material facts, that they were false, and made by defendant without reasonable ground to believe them to be true, and with intent to defraud, and that plaintiff was reasonably entitled to, and did in fact, rely on the same to his damage.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 23, Fraud, §§ 46, 47.]

3. SAME—RATIFICATION OF CONTRACT.

Plaintiff purchased a brick machine from defendant under a written contract which provided that, after the machine had been operated for three days under direction of a man furnished by defendant, plaintiff might either accept or return it. After such trial, although it did not work successfully, plaintiff retained it and gave his notes therefor. Some months afterward, and after the notes had matured, at plaintiff's request they were renewed on his making a cash payment, and a new and supplemental contract was made. For several months more he continued, with the assistance of machinists from defendant's factory, to experiment with the machine; but they were unable to make it work successfully. Held, that such facts would not sustain an action for fraud and deceit, on the ground that the machine failed to comply with oral representations made by defendant as to its successful operation and capacity, both because the provision of the contract giving plaintiff the right to reject the machine if not satisfactory negatived any intent to defraud, and because the renewal of the notes after a longer and unsuccessful trial was a waiver of any such right of action, if it existed, and a ratification of the sale.

Sanborn, Circuit Judge, dissenting.

In Error to the Circuit Court of the United States for the District of Minnesota.

Silas M. Finch (John H. Steele, on the brief), for plaintiff in error.

Clarence A. Webber (Fred B. Dodge, on the brief), for defendant in error.

Before SANBORN and ADAMS, Circuit Judges, and PHILIPS, District Judge.

PHILIPS, District Judge. The plaintiff in error, on March 20, 1907, brought suit against the defendant in two counts, which will be considered in their order. The plaintiff was and is a citizen of the state of Minnesota, and the defendant is a corporation organized under the laws of the state of Missouri, with its principal office in the city of St. Louis. The substance of the allegations of the first count is that prior to March 20, 1905, the defendant represented to

*Rehearing denied June 19, 1908.

162 F.—14

the plaintiff that a secondhand three-mold Andrus brick press owned by it possessed certain qualities which fitted it for making brick out of sand and cement, and that it was capable of manufacturing a given quantity of brick per day; that the plaintiff, relying upon said representation as true, was thereby induced to enter into a written contract for the purchase of said press at the sum of $1,000; that he built a concrete foundation for said press, furnishing material, etc., at an expense of $1,500. It is then alleged that said representations were false and fraudulent, and so known to be to the defendant, and were made to induce him to enter into said contract; that the press was out of repair, broken, and incapable of being operated, which was well known to the plaintiff, whereby he was damaged in the sum of $2,500, in addition to the expenditure of the sum of $1,000 in setting up said machine, and for materials furnished in trying to operate it. The answer, after admitting the existence of the corporation and its residence, denied each and every other allegation otherwise alleged in the petition.

The proof was that the contract was in writing, in the form of a letter addressed to the plaintiff by F. C. Frost, of date March 20, 1905, which was accepted by the plaintiff on the same day in writing. There was nothing on the face of this writing to indicate that the defendant was a party thereto or had any responsible connection with the transaction. The oral testimony tended to show that whatever representations or statements as an inducement to the plaintiff to enter into the agreement were made by Frost. The evidence further shows that said agreement was changed or modified on the 20th of April, 1905, in writing, signed only by said Frost on his own behalf and by the plaintiff. It contained the following provision:

"This additional agreement is hereby made part of the original agreement herein, and is in consideration of the payments therein provided for, and is to be considered of effect from date of original instrument."

While the evidence showed that, at the time the negotiations leading up to the contract were conducted between Frost and the plaintiff, the machine in fact belonged to the defendant, it was in Frost's possession, who obtained from the defendant the lowest price it was willing to take for it. The evidence discloses the fact to be that Frost sold the machine to the plaintiff on his own account, in connection with a lot of other machinery and articles belonging to him, at the aggregate price of $1,500, and that he realized about $1,100 on account of the machine in question, which he obtained from the defendant at a sum not exceeding $1,000, including transportation charges. The petition was not framed on the theory that in making the contract in his name Frost was in fact acting merely as the agent, and therefore the defendant should be held responsible for any misrepresentations he may have made.

More than this, the facts developed on the trial furnish a further sufficient reason why, on the issues joined on this count, the plaintiff could not recover. The machine proving unsatisfactory to the plaintiff, on the 17th day of July, 1905, by written contract, he bought from the defendant another machine, designated as a "four-mold An-

drus improved brick press," at the price of $4,000, and as part payment thereon, the defendant allowed to the plaintiff a credit of $1,-500 on account of the said three-mold Andrus press, which the plaintiff was to reship to the defendant at Keokuk, Iowa. When he consented to be thus credited on the purchase price of the four-mold machine, he waived any claim he might have for the damages sued for; so that, had he alleged in the petition that Frost was acting as the agent of the defendant, and, therefore, it should be held responsible for the alleged misrepresentations of Frost, the defendant could have answered that any damages resulting from the sale of the first machine were settled, by accord and satisfaction, on the 17th day of July, 1905, in the manner above stated. The Circuit Court was therefore warranted in holding that the proof did not sustain the allegation of the petition, and in directing a verdict for the defendant as to the first count.

The second count of the petition, in substance, alleges that on or about the 17th day of July, 1905, the defendant represented to the plaintiff that a certain four-mold Andrus improved brick press, with its equipments, was a new machine manufactured by the defendant, capable of manufacturing sand and cement brick, and, when properly set up, was capable of manufacturing 16,000 bricks per day, running 10 hours; that, relying upon said representations and believing them to be true, he was induced to enter into a written contract with the defendant, agreeing to pay for said last-named press the sum of $4,000 and the freight from Keokuk, Iowa, to Minneapolis, Minn., amounting to $125, which freight the plaintiff paid on the arrival of the press at Minneapolis; that, relying on the truth of said representations, he was induced to perform labor and furnish material in building a foundation, and to furnish fuel to operate the same to the amount of $1,000; that said press failed to make brick to the amount of 16,000 per day, or any quantity, and that it was worthless; that the plaintiff was thereby induced to make, execute, and deliver to the defendant three promissory notes in part payment of said press, bearing the date of November 25, 1905, for the sum of $2,159.50, with interest from date, which notes the defendant fraudulently transferred for value to a third party, who had obtained judgment against the plaintiff thereon for the full amount thereof. The petition then charges that the said representations were false and fraudulent, known to the defendant to be such at the time they were made, and were made for the purpose of deceiving and defrauding him. The damages claimed are $6,059.

To this count the defendant tendered the general issue, except as therein admitted. It admitted entering into a contract in writing with the plaintiff, attached as "Exhibit A" to the answer. The answer further alleged that on or about the 25th day of November, 1905, it and the plaintiff entered into a further contract, supplementary to said "Exhibit A." which is attached to the answer as "Exhibit B," which said contracts constitute the only agreements between the parties. It then alleged delivery of the machine, its acceptance by the plaintiff in accordance with the contract, and the execution of

the note and making the cash payment in performance of the terms of the contract. The answer further alleged that on or about the 25th day of November, 1905, at the time of the execution of said supplemental contract, "Exhibit B," the plaintiff delivered to the defendant the promissory notes therein agreed to be delivered. It admitted that before the maturity of the last-mentioned notes it transferred them to third parties, but as to whether or not a judgment had been rendered thereon against the plaintiff it denied any knowledge or information sufficient to form a belief, and alleged that the plaintiff had never paid said notes, or any part thereof. The answer further pleaded that on the 25th day of November, 1905, after full opportunity to test said machine, and after testing the same, the plaintiff in adjustment, paid the defendant the sum of $400, as set forth in the said "Exhibit B," as part of the contract price of the machine, and executed to it the three promissory notes mentioned in the amended complaint and in said "Exhibit B."

The reply denied that the said machine was accepted by the defendant as conforming to the contract, and alleged that the contract, "Exhibit B," and the notes mentioned therein, were obtained by plaintiff through false and fraudulent statements and representations made by the defendant at the time, and denied that on the 25th day of November, 1905, there had been full opportunity to test said machine, or that it had been tested to the satisfaction of the plaintiff, and charges that the sum of $400 was paid and the said notes executed through fraudulent statements and representations made by the defendant at that time.

At the conclusion of the plaintiff's evidence the court directed a verdict for the defendant. The question to be decided is, did the court err in so doing? It matters not on what ground the court placed its ruling, as it will not be disturbed on writ of error if it is justified by the facts and the law. The action predicated in the petition is essentially for fraud and deceit, ad damnum. To authorize recovery in such action, the burden rests upon the plaintiff to establish:

"First, that the defendant has made a representation in regard to a material fact; secondly, that such representation is false; thirdly, that such representation was not actually believed by the defendant on reasonable grounds to be true; fourthly, that it was made with the intent that it should be acted on; fifthly, that it was acted on by complainant to his damage; sixthly, that in so acting on it the complainant was ignorant of its falsity and reasonably believed it to be true." Southern Dev. Co. v. Silva, 125 U. S. 250, 8 Sup. Ct. 882, 31 L. Ed. 678.

In Lord et al. v. Goddard, 13 How. 211, 14 L. Ed. 111, Mr. Justice Catron said:

"The gist of the action is fraud in the defendant and damage to the plaintiff. Fraud means an intention to deceive. If there was no such intention, if the party honestly stated his own opinion, believing at the time that he stated the truth, he is not liable in this form of action, although the representation turned out to be entirely untrue. Since the decision in Haycraft v. Creasy, 2 East, 92, made in 1801, the question has been settled to this effect in England. The Supreme Court of New York held likewise in Young v. Covell, 8 Johns. 23, 5 Am. Dec. 316. That court declared it to be well settled that this action could not be sustained without proving actual fraud in the defendant, or an intention to deceive the plaintiff by false representations. The simple

fact of making representations, which turn out not to be true, unconnected with a fraudulent design, is not sufficient. This decision was made 40 years ago, and stands uncontradicted, so far as we know, in the American courts."

In Thorwegan v. King, 111 U. S. 549, 553, 4 Sup. Ct. 529, 532, 28 L. Ed. 514, it was held to be error to refuse the following declaration of law:

"The jury are instructed that unless the evidence clearly shows that defendant, with intent to defraud the plaintiff, falsely represented to him some material facts alleged in the petition and relied on by the plaintiff, whereby plaintiff to his damage was induced to enter into the contract, then they must find for the defendant."

Mr. Justice Matthews said:

"The proposition contained in the request is a correct statement of the law and strictly applicable to the case."

Again, in Dushane v. Benedict, 120 U. S. 636, 7 Sup. Ct. 697, 30 L. Ed. 810, Mr. Justice Gray said:

"If the seller falsely represents to the buyer that the goods are of a certain quality or fit for a certain purpose, he is liable to an action for the fraudulent representations, although they are not in a form to constitute a warranty; and in such a case the action must be in tort in the nature of an action of deceit, and must be supported by proof that he knew the representations to be false when he made them."

This rule has been repeatedly recognized in this jurisdiction. In Shippen v. Bowen (C. C.) 48 Fed. 659. Judge McCrary, speaking to an action of deceit on the sale of bonds represented to have been genuine when they were worthless, said:

"The counsel for plaintiff insists that in such a case as this no scienter need be alleged, nor, if alleged, need be proved. I am unable to concur in the soundness of this proposition. The contention of the plaintiff's counsel is that, because the mere sale of the bonds rendered the seller liable upon an implied warranty of their genuineness, he is equally liable for an implied tort; but this argument fails to note the distinction between an action upon an implied contract of warranty of the genuineness of the bonds sold and an action for deceit or misrepresentation sounding in tort. It is impossible to conceive the idea of a tort as separate and apart from an intentional wrong and injury, or such negligence or other misconduct as necessarily to imply such wrong or injury. A scienter is the very gist of a tort. To say that one may recover in tort without proving a scienter is to say that he may omit from his proof the chief element of his case."

In Glaspie v. Keator, 56 Fed. 203, 5 C. C. A. 474, Judge Thayer, speaking of an instruction to a jury in a case of fraud and deceit, said it was correct—

"in view of the fact that the jury were further advised that, in order to hold a person liable for fraud in making such a representation, they must be satisfied that he did not actually believe the facts to be as represented, or that he had no reasonable ground for supposing it to be a representation."

And in U. P. Ry. v. Barnes, 64 Fed. 83, 12 C. C. A. 50, Judge Sanborn, speaking of this character of action, said:

"Such an action requires for its foundation a false statement knowingly made, or a false statement made in ignorance of and in reckless disregard of its truth and falsity, and of the consequence such a statement may entail. The evil intent—the intent to deceive—is the basis of the action. Such an

intent, it is true, may be inferred from the positive statement as of his own knowledge of a fact concerning which one knows he has no knowledge at all, because such a statement shows such a contempt for the truth, and such a reckless disregard of the rights of others who may rely upon it, that it is deemed sufficient evidence of an evil intent to warrant a recovery when damages have resulted from the falsehood."

Does the evidence in this record bring the plaintiff's grievance within the rule? The only letter respecting the "Andrus four-mold sand-cement brick press" written by the defendant to the plaintiff prior to the sale was of date February 4, 1905, which is as follows:

"Dear Sir: Answering your favor of the 1st, we are inclosing you an illustration of the Andrus four-mold sand-cement brick press. This press we can recommend for making 18,000 to 20,000 face brick per day. You will notice that the brick made on this press are pressed on the side, and consequently cured on the side. This, then, gives the contractor a chance of selecting between two faces, as both of them remain intact. We have no idea what you have in prospect, Mr. Schagun, for you do not state; but, if you are contemplating going into the sand-cement brick business, we would advise that you call and see our representative in your city, Mr. F. C. Frost, Phœnix Bldg. We believe it would be decidedly to your advantage to investigate this subject, as we have a great deal of success in this line, and believe that there is a future to the sand-cement brick."

In its essence, this was nothing more than a recommendation of the four-mold press. The plaintiff was asked "to investigate this subject." He did not buy this kind of a press upon that representation, but negotiated with and bought of Frost the secondhand three-mold press, declared upon in the first count of the petition. The record fails to show any other letter from the defendant to the plaintiff respecting the four-mold press prior to the time of entering into the written contract of July 17, 1905. This contract was consummated through one Dickinson, defendant's agent at Keokuk, Iowa. The plaintiff claims that he also talked with Frost about it, who was in Minnesota. It developed in the testimony that at that time Frost and one Finch were jointly engaged in the sale of machinery in Minneapolis. At the time of the trial of this case Frost had ceased to be the local agent of the defendant company, and seems to have gone over to the plaintiff in this controversy, furnishing him with all the correspondence that ever transpired between him and the defendant respecting any of this machinery, while his former partner, Finch, appears as counsel for the plaintiff in this case. Frost, being introduced as a witness by the plaintiff, testified in respect of the conversation had between the plaintiff and Dickinson when they were discussing the trouble about the old three-mold press:

"Mr. Dickinson said that he was not sure whether he had put a new attachment on that three-mold press or not, but he thought it would be better for them to buy or put in a four-mold press—four-mold press would do the work alright, without any question; that they had an attachment on that press that they called the 'positive' feed for feeding the material into the machine, and the hopper would be fixed so that the material would drop into the charger box and be carried out to the molds. He said on his return to Keokuk he would take up the matter with his head man, and that if they decided that they could put in the attachment on the three-mold machine they would make it and send it up. If not, he would make out contracts and send up a four-mold machine according to the conditions and terms that they outlined there in the office, which were afterward carried out."

According to this statement the contract sent by Dickinson contained the conditions and terms outlined in the office. Frost later testified that the contract, when drawn by Dickenson, was sent to him, and that he went over the contract with the plaintiff, which contained the terms, and was acceptable to and signed by the plaintiff. Turning to the testimony of the plaintiff, it appears that when Dickinson came to Minnesota in July, 1905, to see about the old secondhand machine, in a conversation between them after that machine was started up, Dickinson said:

"He was not satisfied with it. They had another machine down at the factory which he would send out as quick as he could. He said he had another machine that would do the trick, and make brick, and I would be satisfied with it, and he would guarantee it to do it, * * * and I took his word for it. He said, also, he was going to talk to his expert as to how much it would cost to fix this secondhand machine so it would work, and if he could fix it up he was going to fix it up; and in a couple of days afterward there came a telegram that he was going to send a new machine. He could not do anything with the old machine, and was going to allow me on the secondhand machine for the new machine."

He further testified:

"Mr. Frost said just the same as Mr. Dickinson—that the press would do the work, and he guaranteed it to do it. He said it would make so many brick. * * * He said it was a good press. It was guaranteed to do the work."

He was then asked by his counsel:

"Now I will ask you to state what it was that induced you to enter into this contract? A. He said the machine would turn out the brick, would make the brick, and I would be well satisfied with it in a short time. If it didn't, he said he was going to send a man to fix it up, and if he couldn't make it work—make it do good work—he would send another man to fix it up."

It is not charged in the petition that the contract was not drawn up according to the understanding of the parties; and if, as Frost testified, the contract contained the terms and understanding in the altercations of the parties, we must turn to it to see what are its provisions. The substance of them is that the defendant agreed to deliver on board cars at Keokuk, Iowa, one completed four-mold Andrus improved brick press, equipped, etc., for filling molds, to be shipped to Minneapolis, by the 20th of July, 1905. The plaintiff agreed to take the press from the cars upon arrival in Minneapolis, pay the freight, build foundation, and connect with the proper driving machinery a machine in accordance with directions to be furnished by the defendant, free of expense to the defendant, to have the same done within five days after its arrival, and to notify the defendant promptly when it was ready to be started. Upon such notice the defendant was to send a competent man to superintend the starting and operating the machine, who was to remain until it was in proper working order, or until the machinery should be accepted or rejected; the plaintiff to pay the said workman the sum of $5 per day and his railroad fare, to furnish a competent man to run and operate the brick press during the time of the trial, and to furnish proper and sufficient driving power, and the sand and cement in proper condition

so as to run the press to its minimum capacity of 16,000 brick per day, while under the supervision of the man sent by the defendant. The plaintiff was to properly handle and care for the press the same as if it were his own, and be answerable for any damage to the press resulting from the want of proper handling, protection, and care, and keep the same insured for a sum not less than $4,000. It also provided that if, at the expiration of the time provided, the press should fail to cut the sand and cement into proper brick form under the conditions specified, and should it be rejected by the plaintiff, he would promptly remove the press from the brickyard, place it on board cars, and have it delivered at Minneapolis, subject to the order of, and free from cost and charges to, the defendant, in the same condition as when received, excepting the wear, tear, and breakage incident to the trial. The plaintiff agreed to accept or reject the press on or before the expiration of three days after it had been started and running properly and cutting sand and cement into brick form, and the defendant agreed to refund the money paid upon the purchase price of said press, excepting freight charges and expenses of a man to superintend the trial experiment, in case the machine was rejected by the plaintiff, and agreed to honor the sight draft of the plaintiff for that amount, with bill of lading covering shipment of the press, showing delivery of the press to carrier, etc. The purchase price was fixed at $4,000, $1,500 of which was to be allowed for the three-mold Andrus press hereinbefore mentioned, which press was to be delivered on cars at Minneapolis and consigned to the defendant at Keokuk. The balance, $2,500, was to be paid as follows: $200 cash upon acceptance of the press, $800 within three months, $750 in four months, and $750 in five months. It was further stipulated that the defendant should not be held liable for damages for any delay in the operation of the business of the plaintiff resulting from the trial herein provided for or the rejection of said press. The defendant was to supply duplicates of such parts of the press as might break within a period of two years by reason of defective material or workmanship. The contract concluded as follows:

"It is also mutually agreed and understood that there are no understandings outside of this written agreement, and that any subsequent waiver or alteration of any of the terms or conditions hereof shall be in writing and signed by the parties hereto."

So far from the contract on its face evidencing any deception or artifice, it rather indicates business method and open dealing. The plaintiff got rid of the old machine with a credit of $1,500 therefor, and assumed the expenses of making the experiment, on which the evidence shows he expended only $50 in the erection of a foundation for setting the machine, and he also furnished coal for running the engine, and sand and cement for the experiment. The only evidence to support the action for deceit is that the machine did not make bricks as expected. Negativing, however, a fraudulent purpose on the part of the defendant to sell a machine known or believed to be worthless, the defendant sent its workman, who earnestly strove to make the machine operate successfully, by making changes and employing new

devices, and Mr. Dickinson seemed hopeful all along that the press could be made to do the work.

We fail to find in the record sufficient evidence to justify the inference that the defendant knew, or had reason to believe, when it sold the machine, it would not make the brick. The very fact that it sold, and the defendant took it on trial, tends to negative any fraudulent purpose on the part of the defendant, as it had nothing to make and much to lose in reputation of its manufacture if the machine failed to work. The very terms of the contract indicate that the parties were dealing with each other at arm's length, neither trusting the other. The effect of it was the vendor said: "I have confidence the machine will answer your purpose." The vendee said: ". I want such a machine as you represent, but am unwilling to take your word, and pay for it. I will take it on trial, and, if the test be satisfactory, I will then accept and pay for it, part cash, and balance in time notes." The vendor replied: "Yes; but I will retain title until conditions are complied with." The machine was delivered, and the test made, with unsatisfactory results. The contract expressly provided, in such contingency, that the vendee should return the machine and receive back what he had paid, or promised to pay. It is not perceivable how, under such a sale, the vendee can be heard to claim that the vendor inveigled him into the compact by deceit, merely because the machine failed to do the desired work.

It is suggested that, although the plaintiff by returning the machine could avoid paying the purchase money and recover back what he had paid, he would be damaged to the extent of what he had outlaid in experimenting with the machine. The defendant might aptly reply to this by saying it had to take back its machine as a second-hand machine, with the loss of prestige to its manufacture, all of which was in the contemplation of the parties to the compact, and was in effect written into it. In Holdom v. Ayer, 110 Ill. 448, it is held that the defendant is not liable to the action of fraud and deceit where it appears he did not rely upon the representations charged in the declaration, but upon a guaranty of the defendant—citing Wheeler v. Randall, 48 Ill. 182; Hiner v. Richter, 51 Ill. 299; Merwin v. Arbuckle, 81 Ill. 501; Schwabacker v. Riddle, 99 Ill. 343. In Elphick v. Hoffman, 49 Conn. 331, the petitioner sold defendant certain oyster grounds. Suit was brought on the contract. The defendant set up fraudulent representations in the sale as to the quantity of ground planted and the quality of the oysters. The evidence tending to show that the defendant relied not alone upon the representations, by requiring a written guaranty, it was held he could not avail himself of the fraud as affecting the title. The court said that, if the alleged false representations did not induce the purchase, it was a case of fraud without damage. If he refused to accept the representations, unless put in the form of guaranty, his only redress was on contract. He is not at liberty to lay that aside and resort to fraud. So in McNaughton v. Conkling, 9 Wis. 316, it was held, where the party relied upon a guaranty, he could not recover for false representations.

The plaintiff in the case at bar was indulged to testify to two other

sales of such machines by the defendant. One was to a man named Wunder, at Minneapolis, September 26, 1904. He put in evidence the written contract thereof, which he testified he saw before he signed the contract in question. By the terms of the Wunder contract the machine was to make 16,000 merchantable brick in 10 hours on a certain mixture of sand and Portland cement. The provisions respecting the shipping and paying freight thereon were practically the same as the contract in suit. Wunder was to accept the machine within three days after the completion of the test, and pay part in cash and the balance in notes, and in case of failure of the machine to do the work he was to reject the same and ship it back to the defendant. As the plaintiff offered no evidence of any misrepresentations made by the defendant to Wunder, nor any evidence that the machine did not work successfully, the reasonable inference is that no trouble arose over it; and therefore the further inference should arise that the defendant had good reason to believe, when it contracted with the plaintiff, that the machine was efficient.

If the foregoing views are passed by, there is another reason, founded on fact and law, why this action cannot be maintained. The machine was received and set up by the plaintiff about the 1st of August, 1905, and put to work. On September 29th, the plaintiff wrote to the defendant, apologizing for his delay in replying to a letter from the defendant, in which he said:

"Owing to a variety of unforeseen accidents and disappointments, I have been compelled to give up brickmaking, as so far the brick plant has been all an expense, entirely without any return. We could not get any satisfactory pallets, and have had many other hindrances too numerous to mention; consequently, as I have already put all the money I have into the plant, I could not afford to work it any longer at present. As I am in a very hard predicament just now regarding money matters—in fact, have none at all—therefore I engaged in more profitable business than making brick (at the rate we were doing), and expect about $800 the last of December; and if you could kindly grant me an extension of time until then I can pay you the $200 which I owe you, $300 on the forthcoming payment, allowing me to pay the remainder with the last payment of $750. That would then leave me a small surplus to start the brick plant again, as I already have on hand a large contract to deliver the brick early in the spring, which would then enable me to meet the last two payments. The freight on the returned secondhand machine I will also settle as soon as I possibly can. I assure you that it is from no desire to deprive you of your just rights that I make this request, as it is my intention, and always was, to deal fair, and am doing the best I can toward that end, straining every nerve, almost working night and day, in order to honor your demands. I hope you will take into consideration my request, and endeavor to make some arrangements by which I may be enabled to retrieve myself from my present difficulties. Your compliance would also confer an obligation which will be my endeavor to repay."

The plaintiff worked off and on with the machine until the 25th of November following. According to his testimony, he had then become fully impressed with the fact that the machine was a failure. He had the right under his contract to return it; but he kept it until his cash payment was due and the notes were maturing. About the 25th of November, Dickinson visited Minneapolis and had an interview with the plaintiff, who then urged him for an extension of time for payments. The witness Frost detailed what occurred:

"The plaintiff said it had got so late in the season, and so cold, and on account of the brick having been of material that had to be wet, and after being sprayed 24 hours in order to harden them, it was impossible to make further test; that the notes were coming due and he asked Dickinson to extend the time of payment on these notes until the summer of 1906, and make a personal test of the press in that spring."

Dickinson objected to extending the time of payment. Plaintiff "said that he had been to a great deal of expense and trouble with the press, had been unable to do anything with it, and he thought it was only right to extend the time until he could get the press running in the spring and get to work and make some brick. He had a car load of cement up there and was unable to use it. Dickinson finally consented to an extension of the notes."

Plaintiff then paid $400, and the parties thereupon entered into a supplemental contract, the substance of which is that the plaintiff should pay the sum of $400 (the receipt of which was acknowledged), on account of the money due and becoming due for the machine, and should give three notes for the balance of said indebtedness, in which plaintiff's wife would join—one for the sum of $959.50, due June 1, 1906; one for $600, due July 1, 1906; one for $600, due August 1, 1906, with interest, etc.; "the said amount being the balance due upon said machine." As additional security for the payment of said notes, the plaintiff agreed to sell to the defendant about 180 barrels of cement on the ground where the machine was located to be used in making brick, and the brick, when so made, to be the property of the defendant and sold; the proceeds to be paid over to Finch for the benefit of the defendant, but Finch should take out a sufficient amount of money to pay for the necessary expenses of manufacturing the brick and the material therefor. The defendant should keep an itemized account of all such costs and expense, and render a statement to said Finch after commencing to make brick. The defendant was to surrender to the plaintiff the three promissory notes, aggregating $2,300, given on the sale of the machine, which the defendant accordingly surrendered. The plaintiff continued to hold and deal with the machine as his own.

In Negley v. Lindsay, 67 Pa. 217, 227, 228, 5 Am. Rep. 427, Judge Sharswood held that it was the better recognized rule that a contract tainted by fraud may be confirmed or ratified without a new contract founded on a new consideration; that he who knowingly accepts or obtains any benefit under such contract, or who uses the property after the discovery of the fraud, or does any positive act forgiving the fraud, or unduly delays claiming back his property, affirms the validity of the contract—citing Jones v. Emery, 40 N. H. 348; Masson v. Bovett, 1 Denio (N. Y.) 69, 43 Am. Dec. 651. " 'Ratification,' says Chief Justice Lowrie, 'is in general the adoption of a previously formed contract, notwithstanding a view that rendered it relatively void; and by the very nature of the act of ratification, confirmation, or affirmance * * * the party confirming becomes a party to the contract.' He that was not bound becomes bound by it, and entitled to all the proper benefits of it. * * * If it be merely against conscience, then, if the party, being fully informed of all the circumstances of it and of

the objections to it—in his own words, 'with his eyes open'—voluntarily confirms it, he thereby bars himself of that relief, which he might otherwise have."

In People v. Stephens, 71 N. Y. 527, 554, it is held that payment voluntarily made under an executory contract for work and labor, with knowledge of the facts upon which fraud from the inception of the contract might have been claimed, cannot be recovered back, or damages recovered for the fraud. Rapallo, J., said:

"As the contract was executed before the discovery of the fraud, there was no doubt of the right of the defrauded party to retain the property to recover damages for the fraud, and, as the consideration for the demise had not been paid, it is a plain case for recoupment. It is well settled that a party is not bound to return the property he has been induced by fraud to purchase, but may retain it and take his remedy by action for the fraud. But it by no means follows, either logically or legally, that one who has made an executory contract for property to be delivered and paid for in the future, and discovers that he has been cheated, and without objection or protest receives the property and pays for it, may then sue for the fraud. The fraud in such case is consummated and legal damages incurred by the acceptance of the property and paying for it. The parting with the consideration constitutes the legal damage, and that, being done with full knowledge of the cheat, fraud, or deception, cannot be alleged."

In Edwards v. Roberts, 7 Smedes & M. (Miss.) 544, it is held that if a party has knowledge that he has been defrauded, and yet subsequently confirms the original contract by making new agreements and engagements respecting it, he thereby waives the fraud, and abandons his claim to relief. In that case the party claimed to have been defrauded in a contract of purchase of land by misrepresentation of the vendor as to the quality and title, about which there was some arbitration had. The court said:

"Whatever, therefore, may be the merits of the original position assumed by Edwards respecting the charge of fraud having been practiced upon him in the purchase, the fact of his having consented to abide by the result of an arbitration upon the matters in dispute, and above all the circumstance that he acted upon the award, however unwillingly, and gave a new note to Roberts in accordance with the terms of that award, constitute such a reaffirmance of the contract as was a virtual relinquishment of any right to relief which he might up to that time have possessed."

In a suit upon a promissory note against the maker by an indorsee, the answer alleged that the note was procured by fraud. It was held that it was a good reply thereto that after the assignment and maturity of the note the defendant verbally agreed that, in consideration of the extension of time of payment for a specified period, the agreement was a waiver of the fraud and a ratification of the contract. The court said:

"We do not hold that any new contract was created thereby, but that the old one was in that way recognized and ratified."

The court further said:

"The allegation in the reply that the appellee promised to pay the note after its execution on a reasonable and easy condition is inconsistent with the averments in the answer that the note was procured by fraud." Doherty et al. v. Bell, 55 Ind. 205.

In Schmidt v. Messmer, 116 Cal. 267, 48 Pac. 54, after recognizing the doctrine that a party to the contract may elect to rescind it on account of fraudulent representations, when he acts promptly upon discovering the fraud and putting the other party in statu quo, or may affirm the contract and sue to recover damages for the deceit, the court said:

"The rule which relieves a party when he elects to sue for damages [is that] he must stand toward the other party at arm's length, must comply with the terms of the contract on his part, and must not ask favors of the other party, or offer to perform the contract on conditions which he has no right to exact, and must not make any new agreement or engagement respecting it; otherwise, he waives the alleged fraud."

In that case the party was alleged to have made misrepresentations as to the amount of income received monthly from a hotel leased by the defendant to the plaintiff. The defendant occupied the premises about 17 months after knowledge of the facts constituting the fraud, without making complaint that any false representations had been made, asked for a reduction of rent, and was permitted to give a new note for unpaid rent. It was held that the fraud was waived. In St. John v. Hendrickson, 81 Ind. 350, the court said:

"We fully recognize and approve the rule that a party may retain what he receives, stand by his bargain, and recover for the loss caused him by the fraud. * * * We neither hold, nor mean to hold, that affirmance by retention of the thing bargained for cuts off an action for damages. We do hold that where a party, with full knowledge of all the material facts, does an act which indicates his intention to stand to the contract and waive all right of action for fraud, he cannot maintain an action for the original wrong practiced upon him. Where the affirmance of the contract is equivalent to a ratification, all right of action is gone. * * * Nor are we unmindful of the settled rule that the defrauded party has an election of remedies. * * * We do decide that where a party, with full knowledge, declines to repudiate an action known to him to be fraudulent, and fully and expressly ratifies it, he can neither rescind nor maintain an action for damages."

The conduct of the plaintiff in dealing with this property, after the adjustment of November 25, 1905, clearly enough shows that the imputation of fraud and deceit in the original and in the supplemental contracts is an afterthought, born when his counsel brought this suit. On February 18, 1906, the plaintiff wrote the defendant:

"I would like to know if you have brick plates for fancy trimmings. We have calls for fancy brick for trimmings. We have not been doing very much in making brick, but intend to start soon."

The defendant evidently answered this letter; for on the 13th day of March following the plaintiff acknowledged the receipt, saying that he had been too busy to find time to write, and adding:

"We started the plant going last week, but we cannot make it run good, for the cement sticks so on the top plates that we all have to stop and brush it off."

In February, 1906, the plaintiff's testimony shows that he dealt with the property as his own, by taking off the friction and shaft of the machine, an essential part of it, and lending it for three or four days to a neighbor to apply on his machine. He continued to experiment with the machine through the spring of 1906, and Dick-

inson and machinists from the defendant's factory were trying to remedy the defects, when the plaintiff put the matter into the hands of his attorneys. In view of the facts and circumstances disclosed by this record, this action for fraud and deceit cannot be maintained.

The judgment of the Circuit Court must be affirmed.

SANBORN, Circuit Judge (dissenting). There was substantial and undisputed evidence in this case that the defendant induced the plaintiff to make the contract of July, 1905, to purchase the four-mold machine, to make the subsequent contracts about it, to retain and try to operate it, by false representations, before the defendant saw the machine, that it would manufacture out of sand and cement 16,000 bricks in 10 hours, and by subsequent repeated representations of the same nature and promises that it would make the machine comply with the representations. There was undisputed evidence that the machine would not manufacture, and the defendant could not make it manufacture, any considerable amount of brick out of sand and cement; that the defendant suffered damages from these false representations, in that he expended $50 for a foundation for it, $75 for moving it, and surrendered a three-mold machine and a claim for fraudulent representation in its sale estimated worth $1,500 before he tested the machine at all; that he paid about $1,000 in cash, and gave his notes for more than $2,000, which the defendant subsequently sold for value and upon which the indorsee recovered judgment against him, In my opinion here was ample evidence to sustain an action for damages for false representations.

The plaintiff was ignorant of the capacity and character of the press. He was a purchaser. The defendant was a seller. A vendor is presumed to know the character and capacity of a machine which it manufactures or sells. Concede that the defendant was ignorant of the worthlessness of the press which it sold, and that it never intended to defraud the plaintiff, as it did defraud him out of more than $3,000, yet it was liable under the law for the damages which resulted from its false representations. It made the material and false statement as of its own knowledge that the press was capable of manufacturing 16,000 bricks per day out of cement and sand. If it knew that this statement was false, its making was fraud of the most positive character. If it did not know whether the statement was true or false, its positive statement of it was a false representation that it did know so, and was as damaging to the plaintiff as it would have been if it had known it to be false, and was equally fraudulent and actionable. "If one states of his own knowledge material facts susceptible of knowledge which are false, it is fraud which renders him liable to the party who relies and acts upon that statement as true, and it is no defense that he believes the facts to be true." Litchfield v. Hutchinson, 117 Mass. 195, 198; Barnes v. Union Pacific Ry. Co., 4 C. C. A. 199, 201, 202, 54 Fed. 87, 89, 90; Cooper v. Schlesinger, 111 U. S. 148, 155, 4 Sup. Ct. 360, 28 L. Ed. 382; Kiefer v. Rogers, 19 Minn. 32, 36 (Gil. 14); Slim v. Croucher, 1 De Gex, F. & J. 518; Hazard v. Irwin, 18 Pick. (Mass.) 96; Savage v. Stevens, 126 Mass. 207, 208; Frost v. Angier, 127

Mass. 212, 218; Jewett v. Carter, 132 Mass. 335, 337; Cole v. Cassidy, 138 Mass. 437, 438, 52 Am. Rep. 284; Masson v. Bovet, 1 Denio (N. Y.) 69, 73, 43 Am. Dec. 651; Lockbridge v. Foster, 4 Scam. (Ill.) 569, 573; Joice v. Taylor, 6 Gill. & J. (Md.) 54, 58, 25 Am. Dec. 325; McFerran v. Taylor, 3 Cranch. (U. S.) 270, 2 L. Ed. 436; Doggett v. Emerson, 3 Story (U. S.) 700, 732, 733, Fed. Cas. No. 3,960; Burrows v. Lock, 10 Ves. 470, 475; Ayre's Case, 25 Beav. 522; Rawlins v. Wickham, 3 De Gex & J. 304, 313; Sears v. Hicklin, 13 Colo. 143, 152, 21 Pac. 1022; Haight v. Hayt, 19 N. Y. 464, 470, 471.

It may be that if the plaintiff had refused to rely upon the false representations, if he had not been induced to make the contract by them, and if he had relied upon the guaranty in the contract alone, as in some of the cases cited by the majority, he would have had no cause of action for the fraud; but the evidence in this case in undisputed that he relied upon the false representations, and that he was thereby induced to enter into the contract which contains the guaranty. It was no defense to this action for this fraud in this state of the case that the defendant embodied its false representations in a written agreement and guaranteed them to be true, or that it promised to make them good. Nor was it a defense that the plaintiff, induced by subsequent false promises and representations of the defendant, which it reiterated until it had collected all the money it could squeeze out of him and had placed his notes beyond defense by a sale of them to an innocent purchaser, continued to try to perform, or failed completely to perform, his contracts. Parol agreements made in good faith are merged in subsequent contracts; but false and fraudulent representations, which induce contracts, are torts. They are not merged in subsequent agreements which do not clearly release or discharge them, and the damages which such representations cause may be recovered, regardless of the terms of such contracts or of their performance. Barnes v. Union Pacific Ry. Co., 4 C. C. A. 199, 203, 204, 54 Fed. 87, 91, 92, and cases there cited; Wardell v. Fosdick, 13 Johns. (N. Y.) 325, 327, 7 Am. Dec. 383; Ward v. Wiman, 17 Wend. (N. Y.) 193, 196; Culver v. Avery, 7 Wend. (N. Y.) 380, 22 Am. Dec. 586; Whitney v. Allaire, 1 N. Y. 305; Id., 1 Hill, 484; Id., 4 Denio (N. Y.) 554.

The authorities cited by the majority to the effect that the supplemental contract of November, 1905, and the plaintiff's action thereunder ratified and confirmed the original agreement, and so barred plaintiff from rescinding it and from defending an action by the defendant upon that contract, probably announce a correct rule of law. To that effect, and to that effect only, are Negley v. Lindsay, 67 Pa. 217, 227, 228, 5 Am. Rep. 427, Edwards v. Roberts, 7 Smedes & M. (Miss.) 544, and Doherty v. Bell, 55 Ind. 205. But this is not an action to rescind the contract or to enforce it, and hence these cases are not apposite to the issue here under consideration.

In St. John v. Hendrickson, 81 Ind. 350, cited by the majority, Hendrickson, who had been induced to pay $800 into and to become a member of the partnership by the false representation that two of

the partners had invested $800 each therein, brought an action for damages for the fraud, and the defendants pleaded that after he had learned the truth they offered to release him from the partnership and to place him in the same situation that he occupied before he became a member of it, but that he repaid to them the money they returned to him, elected to remain a member of the firm, bought out the interest of two of the partners, and assisted in conducting the business; and the court held that these facts constituted a good defense to his action. If the Scott Manufacturing Company had offered to release Schagun from his contract, and had repaid to him the value of his three-mold press and of his claim on account of its purchase, which they estimated worth $1,500, and the other moneys he expended before he learned of the fraud, this case would be analogous to the Hendrickson Case; but, in the absence of any such offer or repayment, it does not seem to me to be governed by it.

People v. Stephens, 71 N. Y. 527, another case cited by the majority, was an action by the state of New York to recover of contractors the difference between the reasonable value of the work they had done and the agreed price, which the state had paid them, upon the ground that their contract was the result of a fraudulent combination of bidders. The action failed because the state knew of the fraud before it paid out any of its money, and thereafter elected to carry out the contract and to pay the contract price for the work. The court applied the rule "volenti non fit injuria," but it said in the course of the opinion:

"It is also well understood that, if fraud is not discovered until after a contract entire has been partly or wholly performed and the defrauded party has parted with his property or money, he need not rescind, but may affirm the contract and bring an action for the damages." 71 N. Y. 553.

In Schmidt v. Mesmer, 116 Cal. 267, 48 Pac. 54, the plaintiffs were induced to lease a hotel by a fraudulent representation of the amount of income derived from it. They learned the truth before they paid any rent or occupied it a day. The rent was due monthly. They paid it for 14 months, took extensions of time to pay 2 months' rent, and occupied the hotel without objection or complaint for 17 months, and then brought an action for the false representation, which failed.

All these cases differ from that in hand in the very material particular that the plaintiffs did not part with their money or property until after they had learned the truth, while in the case at bar the plaintiff parted with his three-mold press, his claim for damages for the fraudulent representation in its sale, and the moneys expended for the foundation and for moving the press, before he had any notice or knowledge of any defect in the machine he bought. For this reason they do not seem to me to rule this case, and the statements in some of the opinions that one who is induced by fraudulent representations to make a contract and to part with a valuable consideration before he discovers the fraud deprives himself of his action for the tort by subsequently ratifying and performing the contract, either according to its original terms or according to subsequent terms and extensions, do not commend themselves to my judgment and seem to

me to be contrary to the established rule of law. The plaintiff had made the contract of July, 1905, and had lost about $2,000 before he tried the machine or discovered the fraud, and his subsequent performance or failure to perform it, in the absence of any release or satisfaction on his part of his cause of action for the fraud, did not, in my opinion, deprive him of it.

The gravamen of this action was the inducement of the plaintiff to make the contract of July 17, 1905, to purchase the four-mold press by the fraudulent representation that it was capable of making 16,000 bricks per day out of sand and cement, when it was worthless and was incapable of manufacturing them in any paying quantities. That cause of action was complete when the contract was made. It was proved by undisputed evidence. The ratification of the contract, the extensions, modifications, partial performance, or partial failure to perform it, and the subsequent contracts about it, in my opinion neither released nor discharged that cause of action. They affected only the causes of action upon the contract. When the contract was made the plaintiff had the option to rescind it, or to perform it and to recover the damages suffered from its breach; but that was a choice of remedies under the contract. His action for tort remained in either event. He had the right to sue, and to recover the $3,000 or $4,000 out of which the defendant had defrauded him by the false representations which induced him to make the contract, whether he rescinded or performed or failed to perform it. In my opinion there was ample evidence of causal false representations and of substantial damage to the plaintiff, which ought to have been submitted to the jury.