*1392 OPINION

Per Curiam:

This case involves a lessor’s attempt to recover damages for lessees’ claimed breach of a contract regarding a five-year lease of commercial property in Las Vegas, Nevada. In My 1993, R. Thomas Merrill contracted to purchase commercial real estate located at 2875 Industrial Road, Las Vegas, Nevada, for the sum of $635,000.00. In order to qualify for the purchase money loan necessary to close escrow, Merrill needed to procure a creditworthy tenant. With the aid of a real estate agent, Merrill entered into negotiations with John DeMott concerning a lease arrangement.
DeMott and his business partner, Waldon Randall Welty, intended to use the property as an expansion of their adult book store and video arcade, Wild J’s Book & Video (“Wild J’s”). The new expansion was to consist primarily of a cabaret, and all parties were aware that DeMott and Welty would need to procure an appropriate adult use permit. The parties were also aware that parking arrangements would be necessary for issuance of the permit; and they speculated that a contiguous lot owned by the Nevada Power Company could be leased for parking purposes.
Merrill entered into a sixty-month lease agreement with DeMott and Welty on January 14, 1994, specifying a lease commencement date of January 1, 1994, despite the fact that escrow had not yet closed on Merrill’s purchase of the property. The agreement provided that Merrill would assign the anticipated lease of the parking lot owned by the Nevada Power Company to DeMott and Welty. Although the language in the lease consistently referred to Merrill as “Landlord,” and defined “Landlord” as the “owner of fee title,” Merrill did not actually become the owner of the fee title until escrow closed on February 8, 1994.
The lease contract between Merrill, DeMott, and Welty contained a contingency clause giving DeMott and Welty the right to cancel the lease with a full refund of rents and deposits if they were unable to obtain an adult use permit for the cabaret within thirty days after the lease commenced. The lease also provided that DeMott and Welty would receive “the month of January 1994 and the first month all improvements are completed and approved (totaling two months) rent free.” A merger clause was also included, specifying, in pertinent part, that “no prior agreement or understanding pertaining to [the lease] shall be effective,” and that the lease could be modified in writing only. Finally, the lease contained a waiver clause specifying that Merrill’s waiver of any lease provision shall not be deemed a *1393 waiver of any other provision or of any subsequent breach by DeMott and Welty.
DeMott claims to have been denied consideration of his application for an adult use permit at some time after the lease was executed, allegedly due to the fact that Merrill did not yet own the property. This claim was never confirmed because DeMott’s testimony on this matter was apparently a hearsay account of what his now deceased employee relayed to him after returning from the Clark County permit office, and the permit office has no record of his employee’s visit.
Despite the claimed bar to application for the permit, DeMott and Welty took possession of the property and began improvements at the beginning of February 1994. DeMott testified that he thought the lease was cancelled by his inability to obtain the permit, but proceeded with the planned renovations in anticipation of salvaging the deal.
Merrill obtained legal title to the property when escrow closed on February 8, 1994. The parties had previously agreed that DeMott and Welty would sublease the property to JeffJohn, Inc., a California corporation with Jeff Goetch as president and DeMott as secretary, treasurer, and sole stockholder. DeMott’s and Welty’s attorney, Neil Beller, sent a letter to Merrill, including the proposed sublease contract, on February 8, 1994. The parties also agreed that DeMott and Welty would receive free rent from February 1, 1994, to February 15, 1994, in consideration for giving Merrill a construction schedule by March 1, 1994, and a set of plans for the improvements by March 30, 1994, as well as releasing Merrill from any claims relating to his ownership of the property during the lease period. Pursuant to this agreement, Beller sent Merrill’s attorney, Gary B. Torpy, a letter dated March 7, 1994, stating, in pertinent part, that his clients “release any claim arising out of or relating to the question of whether [Merrill] owned the property during any period of time in which the Master Lease was in effect.” DeMott and Welty signed the letter.
The sublease commenced on March 1, 1994, and ran for the remainder of the sixty-month master lease period. The sublease provided that the sublessee would assume all remaining obligations of the sublessor under the master lease. In addition, DeMott and Welty provided a written guarantee of the sublessee’s “prompt payment” and “performance of each and every one of the terms, conditions, and covenants” of the master lease.
On March 11, 1994, Merrill and the Nevada Power Company executed a lease under which the lot adjacent to Merrill’s property could be used as customer parking for the cabaret. On the same day, DeMott and Welty filed an application for the adult *1394 use permit. The permit office denied the application on March 24, 1994, citing “insufficient parking” as the basis for denial. Irene Navis, who processes the adult use permit applications for Clark County, testified that the leased lot failed to satisfy the parking requirement because the Nevada Power Company owned the lot, rather than Merrill. She told Beller that “the only way that [he] could use the Nevada Power property for parking was if Mr. Merrill owned the property also, and that he could, then, administratively combine the one bar through the assessor’s office.”
On March 25, 1994, the day after the permit office denied the adult use permit application, Beller sent Torpy a letter attempting to cancel the lease as provided in the contingency clause. Beller wrote, “Please be advised that my client’s application for a zoning variance was turned down due to insufficient parking. Pursuant to [the contingency clause] of the Lease, we wish to cancel the Lease and request a refund of all monies which have been paid to date.” Despite the assertion of Beller’s letter, he did not in fact apply for a zoning variance. DeMott testified that he did not apply for a zoning variance or appeal the permit denial because of the time involved and low probability of success.
Following Beller’s letter attempting to cancel the lease, Merrill put his property back on the lease market. He found a new tenant, who signed a lease on September 13, 1994, and began rent payments on December 1, 1994; however the payments were substantially lower than Merrill had expected under the lease with DeMott and Welty.
Merrill filed suit, seeking to recover rent due under the lease agreement, and DeMott, Welty, Goetch, JeffiTohn, Inc., and Wild J’s, Inc. (“Respondents”) filed a counterclaim for declaratory relief, seeking a declaration that the lease agreement was not enforceable, and attorneys’ fees. Following a trial, the district court entered judgment for Respondents on both the claim and counterclaim, from which Merrill now appeals.
The district court found that the initial master lease agreement was void ab initio as a matter of law because Merrill was not yet the fee title owner of the leased property. Although Merrill argues that procurement of a credit worthy tenant is a common prerequisite for obtaining a purchase money mortgage needed to close escrow, he does not challenge the finding of initial invalidity on appeal. All of Merrill’s arguments posit subsequent validation of the lease as a result of events occurring after he obtained fee title to the property. Accordingly, we decline to consider whether the lease was void at the time of execution as a matter of law. The dispositive issues, as discussed below, are whether Respondents’ acceptance of benefits under the lease should estop *1395 them from challenging its validity, and whether the parties’ conduct or agreement subsequent to Merrill’s acquisition of fee title to the property ratified the lease.

Estoppel

Merrill argues that, although the lease may not have been valid at the time of execution, Respondents are barred from denying the lease’s validity under principles of estoppel. Respondents argue that estoppel should not apply because Merrill did not alter his position in detrimental reliance on Respondents’ conduct.
Although this issue is one of first impression in Nevada, treatises and courts of other states have addressed analogous situations. Merrill emphasizes that “[t]he rule is well settled that during the existence of the relation of landlord and tenant, a tenant is estopped to deny a landlord’s title or to challenge or dispute it.” 49 Am. Jur. 2d Landlord and Tenant § 915, at 734 (1995) (footnotes omitted). “This is because, absent a disturbance of possession, an adverse claim to property has no effect upon the lease.” Id. § 917, at 735-736 (footnote omitted); see, e.g., Campbell v. Hensley, 450 S.W.2d 501 (Ky. 1970); Rockport Shrimp Cooperative v. Jackson, 776 S.W.2d 758, 760 (Tex. Ct. App. 1989) (“As a general rule, as long as the tenant is not disturbed in its possession, a tenant is estopped to deny his landlord’s title or to claim adversely to him, and it is immaterial whether the landlord had title at the time the lease was entered into.”).
While the principle set forth above is useful as a policy guideline, it is not dispositive in the instant case because Merrill is not appealing the district court’s determination that the lease was invalid at the time of execution. Estopping Respondents from denying Merrill’s title to the property was relevant only to the determination of whether the lease was enforceable at the time of its inception. Hence, the narrow issue before us today is whether Respondents are presently estopped from denying Merrill’s right to enforce the lease.
General principles of estoppel provide that “[a] party to a lease may be estopped from asserting that the lease is invalid.” 49 Am. Jur. 2d § 34, at 74 (footnote omitted). “Where a lessee has entered under his lease and occupied or enjoyed the premises, he and his assignees are alike estopped to repudiate the lease because of irregularities affecting, or defects in, such lease.” 51C C.J.S. Landlord and Tenant § 228(2), at 573 (1968); see, e.g., Crown Coco, Inc. v. Red Fox Restaurant of Royalton, Inc., 409 N.W.2d 919 (Minn. Ct. App. 1987). In Crown Coco, a property owner *1396 sued its tenant for rents and taxes owed under a ten-year commercial lease, and the court concluded that “[a] tenant who has taken possession of the premises and paid rent under the lease may not later rely on an alleged defect[] ... to avoid rent and other obligations under the lease.” See also Arvanetes v. Gilbert, 143 So.2d 825 (Fla. Dist. Ct. App. 1962) (Despite tenant’s abandonment of the property, tenants were estopped from denying validity of the five-year lease after taking possession and occupancy of the property and subletting it to a third party.); Lake Shore Management Co. v. Blum, 235 N.E.2d 366, 369 (Ill. App. Ct. 1968) (“Having taken possession and paid rents, the lessees cannot question the validity of the execution of the lease.”).
Estoppel also requires an element of justifiable reliance by the party invoking the doctrine. Richard A. Lord, 2 Williston on Contracts, § 6:62, at 757 (4th ed. 1991). In the instant case, Respondents reply to Merrill’s estoppel argument with the assertion that Merrill did not detrimentally rely on the lease contract. Respondents fail to address the fact that Merrill took the property off the market after he entered into negotiations with DeMott, kept it off the market for the period during which DeMott and Welty possessed the property, and leased the adjacent lot from the Nevada Power Company for cabaret parking purposes. We conclude that each of these actions constituted detrimental reliance by Merrill.
DeMott and Welty undisputedly improved the property, paid rents owed under the lease, and sublet the property to JeffJohn, Inc. These actions were taken after all parties were made fully aware that the property was still in escrow at the time that the lease was executed. DeMott’s and Welty’s improvement of the leased property in preparation for the opening of the cabaret amounted to possession and use of the premises pursuant to their rights under the lease.[1] Because DeMott and Welty took possession of the property as a benefit of the lease, paid rent under the lease, and were fully aware of Merrill’s ownership status at the time the lease was executed, we conclude that the district court erred in holding that Respondents were not estopped from denying Merrill’s right to enforce the lease.

Ratification by conduct

The doctrine of ratification by conduct is similar in application to the principle of estoppel discussed above; however, it operates *1397 to make the contract legally valid rather than simply preventing a party from challenging the contract’s validity. Id. In addition, it is based on a theory of mutual assent, which does not require the showing of detrimental reliance necessary for estoppel. Id. “Generally, contract ratification is the adoption of a previously formed contract, notwithstanding a quality that rendered it relatively void and by the very act of ratification the party affirming becomes bound by it and entitled to all proper benefits from it.” Shagun v. Scott Mfg. Co., 162 F. 209, 219 (8th Cir. 1908).
Respondents rely on Clark Realty Co. v. Douglas, 46 Nev. 378, 212 P. 466 (1922), for their proposition that occupancy of land and payment of rent under an invalid lease creates only a month-to-month or year-to-year tenancy. The district court was apparently persuaded by this citation, as it found that the initially invalid lease between Merrill and Respondents effected a tenancy at will.
A closer reading of Clark suggests an entirely different conclusion. In Clark, the court declined to find that a mere periodic tenancy resulted from the invalid lease because “a void lease, inasmuch as the lessor had no authority to make it, . . . was not, properly speaking, an invalid lease; ... it complied with all the legal requirements as to form and substance.” Id. at 387, 212 P. at 469. The court observed that a periodic tenancy results only when the lease is inherently inadequate, as when it violates the statute of frauds. Id. at 385-86, 212 P. at 468. The court went on to hold that the lease had been ratified by subsequent conduct of the parties, applying the general rule that “[occupation of the premises by lessee, and payment of rent according to the terms of the lease, is usually held to be a ratification by the lessee of an invalid lease.” Id. at 386, 212 P. at 468 (citing to 24 Cyc. 911).
In addition to Respondents’ payment of rent and possession of the property, Merrill argues that Respondents’ entry into a sublease agreement, in which DeMott and Welty subleased the property to JeffJohn, Inc., effectively ratified the master lease. DeMott’s and Welty’s written guarantee that JeffJohn, Inc. would pay all rent and satisfy “each and every one of the terms, conditions, and covenants” of the master lease certainly seems to express an intent to be bound by the master lease. While Merrill cites to persuasive authority for the proposition that an assignment serves to ratify a previously invalid lease as a matter of law,[2] he provides no authority suggesting that this rule applies to subleases. However, the sublease and DeMott’s and Welty’s guarantee of compliance with the terms of the master lease provide powerful corroboration for Merrill’s assertion that the *1398 parties conducted themselves as though they intended to be bound by the master lease.
We find that the lease in the instant case falls squarely under the rule of ratification as expressed in Clark because it is valid as to “form and substance,” and was arguably invalid at the time of execution due only to Merrill’s “lack of authority” to lease land which he did not yet own. After Merrill cured his lack of authority to lease the property by obtaining fee title at the close of escrow, Respondents continued to occupy the premises and pay rent due under the lease. Respondents’ sublease and guarantee further evidenced their intent to be bound by the terms of the master lease. This conduct satisfies the requirements for ratification under Clark. Accordingly, we conclude that the district court erred in failing to find that the lease agreement was ratified by the parties’ conduct subsequent to Merrill’s acquisition of fee title to the leased property.

Ratification by agreement

Merrill argues that the original lease agreement was ratified by express agreement in addition to conduct. Specifically, he refers to the agreement that DeMott and Welty would receive two weeks free rent in exchange for, among other things, releasing Merrill from any liability relating to his ownership status at the time the original lease was executed.
Respondents’ release was provided in a letter from their attorney to Merrill’s attorney, stating that Respondents “release any claim arising out of or relating to the question of whether [Merrill] owned the property during any period of time in which the Master Lease was in effect.” Respondents argue that this letter “ constitute^] nothing more than further negotiations and serves to highlight the fact that everyone was limping along on a month-to-month tenancy.” We conclude that Respondents’ claims that the lease was void ab initio, and that the letter was a mere negotiation, are inconsistent with the language referring to “any period of time in which the Master Lease was in effect.” If the parties mutually believed that no contract had ever gone into effect and that all of their correspondence to date was purely negotiation, then the exchange of a two-week rent credit for the foregoing liability release would have been pointless.
Having determined that the rent credit for liability release exchange constituted a binding contract rather than a “mere negotiation,” the issue of whether the original lease was ratified by agreement turns on whether relinquishment of claims “arising out of or relating to the question of whether [Merrill] owned the property” effects a ratification. We conclude that the agreement *1399 did serve to ratify the original lease based on the apparent intent of the parties. While Merrill could possibly have anticipated consequential damage to Respondents as a result of permit issuance delays caused by Merrill’s late acquisition of title, this seems unlikely. Respondents had already commenced renovation of the property without the permit, and did not otherwise delay their operations pending issuance of the permit. Accordingly, we conclude that the mutually understood purpose of Merrill’s rent credit offer was to dispel any uncertainty about his ability to hold Respondents to the lease, and that the district court therefore erred in holding that the agreement did not effect a ratification of the original lease.

Waiver of performance

Having concluded that the original lease became enforceable at some time after Merrill acquired title to the property in question, there remains the issue of whether Merrill subsequently waived Respondents’ performance under the lease. The district court found that Merrill “waived performance by [Respondents] when he allowed [them] to continue seeking county approval without paying rent.” Issues of whether a waiver has been implied by conduct are questions for the finder of fact. Parkinson v. Parkinson, 106 Nev. 481, 796 P.2d 229 (1990). Because the question of whether a waiver occurred in this case turns on the legal implications of Merrill’s written rent concessions rather than on whether such concessions were made or on the implications of Merrill’s conduct, the determination of whether Merrill thereby waived Respondents’ performance is a question of law, and therefore subject to de novo review. See SIIS v. United Exposition Services Co., 109 Nev. 28, 30, 846 P.2d 294, 295 (1993) (summarizing authority for the conclusion that matters of law are appropriate for de novo review).
It is clear that, absent a waiver, Beller’s March 25, 1994 letter to Torpy, attempting to cancel the lease pursuant to the contingency clause, was legally ineffective because the clause specified that cancellation based on inability to obtain an adult use permit would not be allowed after February 1, 1994. Although Respondents argue that the parties mutually understood that the lease could not stand unless Respondents were able to obtain an adult use permit, the clear language of the contingency clause shifted the risk entirely to Respondents after February 1, 1994, holding them to the lease regardless of whether they were able to obtain a permit. Furthermore, the merger clause provides that “[n]o prior agreement or understanding pertaining to any such matter shall be effective,” and that the lease “may be modified in writing only.”
*1400 The district court concluded that Merrill waived Respondents’ performance under the lease on the basis of Merrill’s rent concessions. Respondents argue that Merrill’s rent concessions “waived the rent as well as the time limitations as a part of continuing negotiation.” In order for Merrill’s concessions to constitute a waiver, they must have involved the intentional relinquishment of a known right. Mahban v. MGM Grand Hotels, 100 Nev. 593, 596, 691 P.2d 421, 423 (1984). Hence, Merrill must have intentionally relinquished his right to collect future rents or to hold Respondents to the February 1, 1994, expiration date of the contingency clause in order to effect a waiver.
The record and pleadings reflect only two instances in which Merrill allowed rent concessions varying from the otherwise applicable rent schedule. The first such instance is a clause in the original lease itself, providing, in pertinent part, that Respondents “will receive the month of January 1994 and the first month all improvements are completed and approved (totaling two months) rent free. ” This provision does not have the legal effect of relinquishing the general right to collection of future rents under the lease, either intentionally or unintentionally. The provision is an element of the lease itself, and simply provides a small exception to the otherwise applicable rent schedule. If the clause effected a waiver, it waived only the right to collection of rent during the “month of January 1994 and the first month all improvements are completed and approved.” The obvious limitation of the rent concession is bolstered by the waiver clause in the lease, which provides that “[n]o waivers by [Merrill] of any provision hereof shall be deemed a waiver of any other provision hereof or of any subsequent breach of [Respondents] of the same or any other provision.”
Merrill’s second rent concession was his offer of free rent for the period of February 1, 1994, to February 15, 1994, in exchange for receipt of a construction schedule by March 1, 1994, and a set of plans for the improvements by March 30, 1994, as well as releasing Merrill from any claims relating to his ownership of the property during the lease period. The language of Merrill’s offer is unequivocal, and clearly does not relinquish his right to collection of rent for any period other than February 1, 1994, to February 15, 1994.
In addition to the obvious and express limitations on Merrill’s rent concessions, Respondents offer no evidence whatsoever that Merrill relinquished his right to enforce the February 1, 1994 expiration date of the contingency clause. If, as Respondents claim, Merrill’s lack of ownership prevented them from obtaining an adult use permit before that date, they were free to rescind the *1401 lease at that point, or to offer to forego recision if Merrill would agree to extend the expiration date with a written modification agreement as required by the merger clause. Respondents failed to take this course of action, and offer no evidence that Merrill intended to relinquish his right to enforce the lease without the expired contingency clause. Accordingly, we conclude that the district court erred in holding that Merrill “waived performance by [Respondents] when he allowed [them] to continue seeking county approval without paying rent.”
After reviewing the various arguments raised on appeal and concluding that the lease at issue is enforceable against Respondents for the foregoing reasons, we reverse the judgment of the district court on both the claim and the counterclaim and remand this case to the district court for further proceedings consistent with this opinion.

 The improvements were relatively extensive, including removal of the old walls and installation of acoustic texture, tiles, and plumbing.

 See Mackey v. Philzona Petroleum Co., 378 P.2d 906 (Ariz. 1963).