Lund v. Fletcher et al.

---

## LUND v. FLETCHER ET AL.

1. MORTGAGE: *Description: Schedule: Recording.*
   When a schedule of the articles mortgaged is referred to as the means of identifying them, and is the only means afforded by the instrument, it is essential to the validity of the instrument, and must be recorded with it. But when the instrument sufficiently identifies the property and refers to a schedule of it for convenience, the schedule is not essential to its validity and need not be recorded.

2. SAME: *Of merchandise retained by mortgagor to sell, etc.*

A mortgage of articles of merchandise left in the possession of the mortgagor with power to sell in the ordinary course of business, is void except between the parties to it; but as to other property not to be sold by the mortgagor, it is good.

APPEAL from *Clark* Circuit Court in Chancery.

Hon. W. E. ATKINSON, Special Judge.

*Smoote & McRae*, for appellant:

1. There is no taint of legal fraud on the mortgage. *Hughes v. Cory, 20 Iowa, 339; Constantine v. Tweloes, 29 Ala., 607; Frankhonse v. Ellett, 22 Kans., 127; Ross v. Wilson, 7 Bush. (Ky.), 29; Enders v. Williams, 1 Metcalf (Ky.), 346; Steadman v. Vickey, 42 Maine, 142; Cent. Law Jour., February 24, 1882, p. 158.*

2. But if the permission to sell and purchase renders the mortgage legally fraudulent, as to other matters, still as to the fixtures, furniture and goods originally mortgaged, remaining at the commencement of this suit, the mortgage is good. It is only where there is *actual fraud,* that the doctrine, that fraud in part vitiates the whole, applies. *Barnett v. Fergus, 51 Ill., 352; Goodheart v. Johnson, 88 ib., 58; Garritson v. Pegg, 64 ib., 111; Ogden v. Stuart, 29 ib., 122; Davenport v. Foulke, 68 Ind., 382; Preston v. Leigh, 6 Md., 88; Fry v. Russell, 35 Mich., 229; Summers v. Roos, 42 Miss., 749; Peiser v. Peticolos, 50 Tex., 638; Cent. L. J., supra, Jones on Chattel Mortgages, sec. 379 to 425.*

3. Appellant's debt being for *purchase-money,* he has a preference lien even without a mortgage. *Const., art. 9, sec. 1.*

4. In regard to the schedule, see *Jones on Chat. Mort., secs. 73–4–5; Byers v. Engles, 16 Ark., 543; Brewster v.*

Lund v. Fletcher et al.

*Clamfit, 33 Ark., 72; Stoughton v. Pasco, 5 Conn., 442; Durell v. Haley, 1 Paige Ch., 492.*

*Cohn & Cohn,* for appellees:

1. The mortgage was void; the schedule was not recorded. (*Barkman et al. v. Simmons, 23 Ark., 1; Herman on Ch. Mort., p. 180; 9 Ark., 112; 20 ib., 190; 18 Ark., 105.*) It is vague and uncertain. *Herman Ch. Mort., sec. 42, p. 82.*

2. It reserves to the mortgagors a power to sell, etc., and apply the proceeds to their own use. *An American phase of Twyne's case, vol. 2, new series Southern Law Review, Jan., 1877, p. 731, et seq.; Herm. Ch. Mort., p. 222 to 244.*

3. When property mortgaged is commingled with that subsequently acquired, it is presumed to be done with the mortgagee's permission, and if it be so intermixed as to prevent identification, the rights of third parties can not be affected. *Hamilton & Robinson v. Rogers, 8 Md., 301; Herm. Ch. Mort., 89 to 96.*

EAKIN, J. Lund was doing business, as a druggist, at Arkadelphia. On the eleventh of March, 1879, he sold his business, fixtures and stock on hand to Fletcher & Co., for $3,346.79, as per inventory then made. The fixtures, consisting of soda font, show cases, etc., were easily retained in kind, for the convenience of the business, and were not intended for sale to customers. Fifteen hundred dollars were paid in cash. The balance was secured by several notes, of varying amounts, all of which have been paid, save two for $615.59 each, one due at two, and the other at three years from date. The last has been assigned to Lincoln & Welch, who are made defendants.

A mortgage was given by the purchasers, which, after reciting the notes, conveyed to the vendor all the stock and

fixtures sold, according to the inventory, which was referred to in the mortgage, but not recorded with it. It also included all drugs, etc., "and each and every other article of drugs, medicines, liquors or merchandise, of whatsoever description, which the party of the first part may hereafter acquire, come in possession of, and keep for sale, or compounding, in the said city, from the date hereof until the eleventh day of March, 1882, or thereafter." It provided that the articles should be kept insured for the protection of the mortgagee; and reserved to the mortgagors the privilege, at their option, of paying any of the notes before maturity. Also, that in pursuing the business of druggists, they should "be allowed to vend and sell drugs, and compound prescriptions from and in said store hereafter, as the demand of the trade, in the usual way, shall require, to the same extent as though this instrument had not been made." *Provided,* there should be no sale of the entire stock without the mortgagee's consent.

After the mortgage had been recorded without the schedule, the vendees of the drug business incurred divers other debts in keeping it up, such as replenishing stock, etc. These creditors sued before a magistrate and recovered a number of judgments, sixteen in all, upon which executions were issued. They were all placed in the hands of a constable, who levied them upon the then existing stock of drugs, fixtures, etc., including some which were in the original purchase and some which were not. By agreement amongst all the creditors, the sale was made under the levy, and the funds produced are held for the benefit of whom it may concern, subject to the result of this suit, which is brought for the purpose of settling priorities. The complaint further shows that after the levies under said executions the defendant Fletcher interposed, and claimed a part of the property to the value of $500 in specific articles, as

exempt from execution ; and that his claim thereto is still litigated. His claim is against the mortgagee as well as against the execution creditors. The prayer is for judgment for the debt; that it be declared a lien superior to that of the execution creditors, or the exemption claim; and that it be paid out of the funds held by the constable. Also for foreclosure as to articles unsold, and for general relief.

Fletcher answered, insisting on his claim for exemption, which, he says, does not embrace anything originally purchased from complainant. The constable and execution creditors demurred; and the demurrer being sustained, Lund appealed.

First, as to the failure to record the schedule with the mortgage.

In the case of *Barkman et al. v. Simmons, 23 Ark., p. 1,* there had been executed a deed of assignment conveying, generally, all the lands of the assignors in the State, "and all goods, wares, merchandise, chattels, notes, bills, bonds, judgments, evidences of debt, securities and vouchers for, and affecting the payment of money, claims, demands, things in action, and property of every name and nature whatsoever of and belonging to the said parties of the first part, *and which* are more particularly and fully enumerated and described in the schedule hereto annexed, and marked schedule A." No schedule was, in fact, attached to the deed. In an action of trover by the assignees against attaching creditors of the assignors, it was held that the mortgage was properly excluded for uncertainty. This was upon the ground that it was apparent that the assignors meant to limit and restrict the general words of the sweeping assignment to the details of the schedule, and that without the schedule it could not be known what the parties actually intended to pass. In that case, as in the case then cited by the court, it is evident that the parties meant to confine the

1. MORT-GAGE:

Description:

Schedule.

effect of the instrument to the articles specified in the schedule, and to make it the means of their identification. Neither the reasoning of the court, however, nor the case itself, with reference to the facts, goes so far as to establish the doctrine that the mere reference to a schedule makes it essential to the validity of a conveyance, when the grantor has, upon the face of the instrument, specifically indicated the limits of the grant in such manner as that the articles may be identified. The sound, common sense distinction is between the cases where the schedule is referred to as the means of identifying the property, and is the only means afforded by the instrument; and other cases when the instrument itself sufficiently identifies it, and refers to the schedule for convenience.

In the case now in judgment the mortgage is, in all its terms and purposes, confined to the business and property of the drug store which had been purchased, and is not a sweeping conveyance of all property, generally, belonging to the mortgagors. Its terms are specific in the beginning; literally, as affecting this point, as follows: " All drugs, chemicals, paints, oils, glassware, whiskies, and sundries of every name and nature whatsoever ; all the fixtures, furniture, show-cases, soda-fonts, and each and every article embracing the entire stock of drugs complete, formerly owned and kept by the said Clinton Lund, party of the second part herein, in the city of Arkadelphia, in the county of Clark, and State of Arkansas ; as is more particularly shown by an inventory of the same, finished on the sixth day of March, A. D. 1879, by the party of the second part, in conjunction with one T. J. Gantt, and Joseph Brown; which inventory is hereto attached, made a part of this instrument, and marked exhibit A."

The distinction between the use of the words as in this case, and and in the case above cited is obvious. In the latter case and has a limiting and restricting force, to qual-

Lund v. Fletcher et al.

ify the general expressions. In this case *as* is only descriptive and, as it were, historical. There is nothing to indicate that the parties meant to qualify their language by the inventory. It is only referred to for a more particular description, by way of convenience, but the intention to transfer all that belonged to the business "complete" remains as clear as before. We think it would be a strained construction to suppose that there might have been some of the fixtures or stock which the parties did not intend to convey, and which would have been disclosed by the inventory.

We are of the opinion, therefore, that the lien, so far as Recording. it was in other respects valid, was not lost by failure to record the inventory. This would be rather too technical to consist with justice, and we pass to the consideration of the true merits involved in the controversy.

The facts alleged disclose no intention of actual fraud. It does not appear that Fletcher & Co. owed any other debts at the time they purchased the stock from Lund; or intended to incur any upon a delusive appearance of credit. The mortgage was to secure the balance of the original purchase-money, and to enable the purchasers to embark in the business. The subsequent debts were small, being all within the jurisdiction of a justice of the peace; and apparently such as would be fairly and legitimately within an honest purpose of keeping up an adequate stock. Viewed as a transaction between well meaning men, none of the provisions of the mortgage seem unreasonable, or inconsistent with the ordinary modes of business. If it be, in any respect, fraudulent, it is so constructively, from considerations of public policy; and whether this be so or not, is the main question presented to us by the demurrer. The plaintiff can not bring, collaterally, to the support of his suit, any of the specific provisions of the Constitu-

Lund v. Fletcher et al.

tion or statute laws, with regard to sales of personal property.

By the first section of article nine of the Constitution, no property shall be *exempt from execution* for debts contracted for the purchase-money. By act of March 9, 1877, repeating this provision in effect, the clerk of the court in an action for the purchase-money, upon petition of plaintiff, may issue an order to an officer, to take possession of the propery, and hold it subject to the orders of the court. But here the plaintiff has no execution to levy; and has not followed the special proceeding. Otherwise, he has no lien, independently of his mortgage. If the mortgage be invalid, the issue as to the exemption is premature. If it be valid, it is unnecessary, since the specific lien would override the exemption.

2. MORT-GAGE: Of merchandise retained by mortgagor to sell. How does the mortgage, upon its face appear in law? This is an important question, never directly decided in this court. In considering it, we are confronted with a multitude of conflicting authorities on three lines. All of them concur in holding that the rigidity of the rule in Twyne's case, must yield to the requirements of modern commercial methods, and the policy of the registration laws, so that there no longer arises a conclusion of law, *ipso facto*, because the mortgagor retains possession. We find it also pretty generally conceded that, in equity, a mortgage may cover future acquisitions, if reasonably connected with the objects of the mortgage, and so considered as to be easily identified.

Such, at least, is the result of our own decisions (*Apperson & Co. v. Moore, 30 Ark., 56*), and, indeed, this must be recognized everywhere, as essential to the prosecution of many of the great industrial enterprises of the day, requiring enormous outlays of ready money, and the issuance of long-time bonds. The most effective and relia-

ble securities may often consist of an aggregate of tools and machinery, or rolling-stock, which the objects of the mortgage require to be constantly renewed.

The difficulty in this case, and the matter wherein the conflict of authority is most noticeable and irreconcilable, arises from that claim of the mortgage which confers or retains the power in the purchasers, and mortgagors, to sell drugs and compound prescriptions in their business as the demands of the trade might require. It is perhaps well to mention in this connection, that the mortgagors contemplated the possibility of their being able to pay the debts before maturity, and inserted a clause reserving that right, but there is no provision whatever for the application of the proceeds of the sales either to the debt or the renewal of the stock.

Whether or not a mortgage of this nature is fraudulent in law, and to be so pronounced on demurrer, independently of the question as to whether it might be considered by a jury as a badge of fraud, to be determined as a fact, has been passed upon by about half the States of the Union. In some the matter has been determined on their particular statutes, but mostly the courts have arrived at different results upon their peculiar views of principle and good policy. The Federal courts have followed the general rule established for them, that in matters not specially within their province, they will follow the decisions and adopt the views of the State tribunals, of the States in which the actions arise.

To review and analyze all the original cases, and to class them, would involve an expenditure of time and labor which the business of this court would not allow. By an examination of some of them in detail, and by the aid of *Mr. Jones' work on Chattel Mortgages, sec. 379, et seq.*, we are enabled to perceive, generally, three lines of decisions

towards one or the other of which the conflicting cases converge.

Some of the courts hold that a power to sell mortgaged goods, in due course of business, does not of itself raise any legal presumption of fraud or render the instrument invalid, although some of them announce that it would raise a presumption of fraud for a jury. This seems to be the view taken by the courts of Alabama, Georgia, Kansas, Iowa, Kentucky, Maine, Massachusetts, Mississippi, North Carolina and Rhode Island.

Others adopting a contrary view, and holding such mortgages, generally, void upon their face, seem nevertheless to concede that they would not be void if it appeared that the sales were not to be for the benefit of the mortgagor personally, but that the proceeds were to be otherwise applied, either to discharge the mortgage debt, or in some other manner, fair to other creditors. This appears to be the current of decisions in Illinois, New York, Indiana, Minnesota and New Hampshire.

Others seem to regard any power whatever to sell mortgaged property, in the course of business, by the mortgagor, as constructively fraudulent in law, making the instrument invalid. Such seems the policy of the courts of Colorado, Missouri, Nebraska, Ohio, Oregon, Texas, Virginia and Wisconsin.

Allowing for all errors and misconceptions in this classification, and referring to Mr. Jones' work, *supra*, for a collection of the cases in the several States, it is nevertheless apparent that, in this conflict and confusion, no special case can have any very persuasive authority. Each State must adopt the line of decision which best accords with its own views of public policy, and seems best sustained by the current of authority.

A majority of this court approve the views of this ques-

tion expressed by Chancellor Cooper, of Tennessee, in the case of *Phelps v. Murray, 2 Tenn. Ch., 746;* considering them based on good reason and sound policy. And the court concurs in adopting them for the decision of this case, and to settle the question in this State, for all cases presenting the same aspect. That eminent jurist, whose ability, judicial temperament and profound study, entitle his opinions to the highest consideration, whilst conceding that a mortgage may be made to cover after-acquired property, and that there may be left in the mortgagor a limited power of disposition over specific articles, with a view to their replacement, such as tools, machinery, rolling stock, etc., denies that such power of disposition consists with a valid lien on personal goods, which can only be profitably used as articles of commerce. He says that such a fluctuating lien, opening to release what is sold, and to take in what may be purchased, is invalid in law, and not enforcible in equity. See case supra.

So far as these remarks apply to a case like this where no provision is made for the application of the proceeds to the payment of the debt, nor to fix a continuing trust upon such proceeds for the purposes of the mortgage, they are adopted by the court; and it results that the mortgage as to the merchandise, was invalid save between the parties, on account of the power left in the mortgagor to sell in the ordinary course of business.

It does not follow however that the mortgage was void *in toto.* It may remain good as to the articles not intended as merchandise, to which the power of sale did not apply. See cases cited at *sec. 351, Jones on Ch. Mort.*

Good as to articles not intended for sale.

Indeed it is good as to all things embraced in it, which can not fairly be intended in the usual commercial sense as meant by "drugs" and the ingredients of prescriptions. In other words, it was good, in this case, save as to all

things which were kept in the drug store to be sold in the usual course of trade, such being evidently the intention of the parties. For this reason it was error to sustain the demurrer, in the absence of any appearance of actual fraud.

The court also erred in dismissing the bill on sustaining the demurrer, although the plaintiff declined to amend. The recital is as follows:

" And the court being sufficiently advised, as to the matters of fact and law arising thereon (to wit, the demurrer), is of the opinion that the same should be sustained, for the reason that the complaint did not state facts sufficient to constitute a cause of action *as against creditors*, and is without equity."

The action was not against creditors alone. Abrahams, the constable who joined in the demurrer, had no personal interest in the suit, and was liable, in any event, to account for the funds, and apply them as the court might direct, according to the priorities which might be fixed. It does not appear that the other creditors would consume the whole fund, and the complainant would be entitled to a decree against him for the remainder. It would have been better practice, in any view of the case, conceding the priority of the execution creditors, to have required them to assert their priorities by answer, and to have retained them for the adjustment of their proportions of the fund. They had agreed that the fund should be held for whom it might concern, and that a suit should be instituted to determine their respective rights.

Besides, Fletcher & Co., the mortgagors, did not demur at all. The mortgage, in any event, was good against them, and a foreclosure was prayed of the articles unsold. The decision upon the demurrer did not dispose of all the case, even if the court had been correct in decreeing the priority of the execution creditors in the whole fund. A

court of equity should not relax its grasp of a case until it has disposed of all matters which it may adjust, and has neatly tied up all loose ends.

For errors in sustaining the demurrer, and in dismissing the bill, reverse the decree, and remand the cause for further proceedings consistent with this opinion, and the principles and practice in equity.