## In re HAWKS.

### (District Court, E. D. Kansas, E. D.   April 16, 1913.)

1. BANKRUPTCY (§ 228*)—FINDINGS OF REFEREE—CONCLUSIVENESS.

Findings of fact by a referee in bankruptcy, while presumptively correct, and not to be reversed unless they are clearly against the weight of the evidence, or some obvious error of law has intervened, are not so conclusive as the verdict of a jury, or the findings of fact by a judge in an action at law where a jury is waived.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. § 387;  Dec. Dig. § 228.*]

2. BANKRUPTCY (§ 312*)—COMPOSITION AGREEMENT—ADVANCEMENTS BY ONE CREDITOR—AGREEMENT TO PAY CLAIM IN FULL—FRAUD.

An insolvent having no money with which to perform a composition with his creditors, an agreement with one of them, who did not sign the composition until all the others had signed, to advance the necessary funds to carry out the composition in consideration of the insolvent's agreement to pay its claim in full, was not fraudulent, so as to preclude such creditor from subsequently proving its entire debt against the insolvent's estate in bankruptcy.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 496-500; Dec. Dig. § 312.*]

3. BANKRUPTCY (§ 184*)—TRANSFERS—VALIDITY UNDER STATE LAWS—POSSESSION.

Under the laws of Arkansas, a merchandise mortgage, with permission to the mortgagor to remain in possession and sell the merchandise without accounting to the mortgagee, is void, regardless of the intention of the parties; but a merchandise mortgage permitting the mortgagor to remain in possession as the mortgagee's agent, and requiring him to pay all moneys realized from the sale of the merchandise, less the expense of carrying on the business and the mortgagor's living expenses, to the mortgagee in satisfaction of the mortgage debt, is valid.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 275-277; Dec. Dig. § 184.*]

4. BANKRUPTCY (§ 314*)—CLAIMS PROVABLE—EFFECT OF MORTGAGE.

A mortgage on a bankrupt's stock of merchandise, fixtures, and bills and accounts receivable, to cover the bankrupt's indebtedness to the mortgagee and any amount necessary to pay prior creditors under a composition agreement, requiring the bankrupt to act as the mortgagee's agent in gathering certain crops, also included in the mortgage and in the sale of merchandise, and to account to the mortgagee for the proceeds, was a mere mortgage, and not a sale of the bankrupt's business to the mortgagee, so as to preclude the latter from proving its claim as a creditor in subsequent bankruptcy proceedings.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 469-473, 478, 483-487, 489, 490;  Dec. Dig. § 314.*]

5. PAYMENT (§ 44*)—APPLICATION.

In the absence of specific instructions from a debtor as to the application of payments, the law applies them to the oldest indebtedness.

[Ed. Note.—For other cases, see Payment, Cent. Dig. § 123;  Dec. Dig. § 44.*]

6. LIMITATION OF ACTIONS (§ 167*)—EFFECT OF BAR—SECURITY.

Under the express provisions of Kirby's Dig. Ark. § 5399, no suit can be maintained to enforce a mortgage, unless brought within the period of limitations prescribed for a suit on the debt secured.

[Ed. Note.—For other cases, see Limitation of Actions, Cent. Dig. §§ 651-653;  Dec. Dig. § 167.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

7. BANKRUPTCY (§ 324*)—CLAIMS—AMOUNT—INTEREST.

Where a commission company, having large and continuous transactions with a bankrupt, on the 1st day of September of every year sent an itemized statement of all the dealings of the parties during that year, showing that the bankrupt was charged with interest at 8 per cent., and that the same was compounded annually, and no objections were made by the bankrupt at any time, such statements constituted accounts stated, and precluded the bankrupt's trustee from thereafter denying the company's right to charge more than 6 per cent. and to compound the interest annually.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. § 511; Dec. Dig. § 324.*]

8. FRAUD (§ 58*)—DECEIT.

Where circumstances relied on to prove fraud are as consistent with honesty and good faith as with a fraudulent intent, the inference of fraud is unwarranted, since, to establish fraud, the proof must be clear, unequivocal, and convincing; evidence sufficient only to create a suspicion being insufficient.

[Ed. Note.—For other cases, see Fraud, Cent. Dig. §§ 55–59; Dec. Dig. § 58.*]

9. FRAUD (§ 58*)—DECEIT—DIRECT EVIDENCE.

It is not essential, to prove fraud, that it be established by direct evidence; but it is sufficient if the circumstances proved are of such a nature as to be convincing and inconsistent with a presumption of honesty.

[Ed. Note.—For other cases, see Fraud, Cent. Dig. §§ 55–59; Dec. Dig. § 58.*]

10. BANKRUPTCY (§ 11*)—RULES OF PROCEDURE.

A court of bankruptcy, in determining an issue of fraud, must be governed by the rules of courts of equity, and, disregarding mere matters of form, ascertain the ultimate relation and liability of the parties, and base its judgment thereon.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. § 11; Dec. Dig. § 11.*]

11. BANKRUPTCY (§ 340*)—CLAIMS—FRAUDULENT CREDIT—ASSISTANCE.

Evidence *held* insufficient to warrant a finding that a claimant against a bankrupt's estate had fraudulently aided the bankrupt to obtain credit for merchandise, in order that the claimant might finally be benefited in the collection of the indebtedness due it.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. § 527; Dec. Dig. § 340.*]

12. BANKRUPTCY (§ 340*)—CLAIMS—FRAUD—EVIDENCE—KNOWLEDGE OF CREDITOR.

Failure or refusal of one creditor to inform others of the indebtedness due him from a common debtor is not evidence of fraud.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. § 527; Dec. Dig. § 340.*]

13. BANKRUPTCY (§ 175*)—FRAUDULENT CONVEYANCES—ANTECEDENT AGREEMENT—EFFECT.

An antecedent agreement by a debtor to turn over to a creditor all his crops, farming implements, stock, horses, mules, and gin, all of which had been bought with money of the particular creditor, whenever it was desired for the creditor's protection, did not render a mortgage subsequently given to such creditor fraudulent as against the mortgagor's other creditors.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 247, 248; Dec. Dig. § 175.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

14. MORTGAGES (§ 50*)—FORM—DESIGNATION OF DEBT—VALIDITY.

A mortgage on real estate to secure an indebtedness of the mortgagor, by failing to designate the amount of the debt due, is not invalid for that reason; the record of such mortgage being sufficient to put a person on inquiry, a prosecution of which would disclose the amount of the debt.

[Ed. Note.—For other cases, see Mortgages, Cent. Dig. §§ 133–140; Dec. Dig. § 50.*]

In Bankruptcy. In the matter of bankruptcy proceedings of J. M. Hawks. On petition to review a referee's decision disallowing the claim of the Allen-West Commission Company. Reversed.

The Allen-West Commission Company, referred to hereinafter as the Commission Company, presented its claim against the bankrupt estate, amounting to $254,490.40, after allowing all credits which it claims the bankrupt is entitled to. It also claimed a lien on certain realty of the bankrupt, which the bankrupt had conveyed by mortgage for the purpose of securing any and all indebtedness due from him to the Commission Company, and asked that, after applying the proceeds from the sale of the mortgaged premises, the balance due be allowed as an unsecured claim. The referee directed the mortgaged lands to be sold free from all liens, and that the proceeds be held pending the determination of the validity of this claim, the allowance of which was objected to by the trustee. The sum realized from the sale of the mortgaged lands amounts to $15,655, and is held subject to final determination of this claim. The original objections filed by the trustee are:

(1) Because the Commission Company holds two life insurance policies, for $5,000 each, on the life of the bankrupt, which were assigned to it as collateral security.

(2) Because a note of $2,500, indorsed by Joseph and Amanda Dudgeon, is barred by the statute of limitations.

The third and fourth objections are that there are included in the account charges for insurance on cotton consigned by the bankrupt to the Commission Company, and also for weighing and sampling the same, without authority of law.

(5) That the Commission Company charged 8 per cent. interest per annum on the account, and compounded it annually, without any agreement in writing therefor.

At a later day additional objections were filed by the trustee, which, for convenience, will be numbered consecutively with the original objections:

(6) That on the 1st day of August, 1899, the bankrupt being indebted to a large number of persons, including the Commission Company, the bankrupt entered into a composition agreement with his creditors, whereby the creditors agreed to accept 40 per cent. of their respective debts, which was also signed by the Commission Company; but that a secret agreement was entered into between the bankrupt and the Commission Company, whereby he promised to pay the Commission Company its debt in full, and executed his notes therefor, which notes constitute a part of the indebtedness now claimed. That these accounts are fraudulent, and should be deducted from the account, if the same is allowed.

(7) That by reason of this fraud the entire claim of the Commission Company should be disallowed.

(8) That the Commission Company was guilty of fraud ever since 1899, by willfully suppressing the fact that the bankrupt was all the time insolvent, and aided him in maintaining a false credit, whereby he was aided to become indebted to the other creditors.

It was also claimed that one of the items was a $2,500 note executed in 1899, which was included in the account when it became due, and interest thereon charged at the rate of 8 per cent. per annum after maturity, although it was only to bear interest at the rate of 6 per cent. per annum.

Some of the items objected to were abandoned. The surrender values of the life insurance policies held by the Commission Company were credited on

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

the amended account, and the overcharge of the interest on the $2,500 note, amounting to $317, was also credited on the account, thus eliminating objections numbered 1, 2, 3, and 4.

There was a great deal of testimony taken by the parties, including almost the entire correspondence between the bankrupt and the Commission Company during the entire period of their dealings, commencing in 1899 and continuing to the date of the adjudication in bankruptcy, the latter part of 1910. The referee disallowed the entire claim, upon the finding made by him that there was co-operation and confederation between the Commission Company and the bankrupt to conceal the true condition of the business and the insolvency of the bankrupt, which was known to the Commission Company; the referee holding, "Without it (meaning the co-operation and confederation between the parties) it was impossible for the bankrupt to have obtained any rating whatever in commercial circles," and that therefore the Commission Company was guilty of such fraud as to justify the rejection of its entire claim.

To review this order the Commission Company has brought the case before this court for review.

Lyon & Swarts and Dwight D. Currie, all of St. Louis, Mo., for trustee.

Moore, Smith & Moore, of Little Rock, Ark., for claimant.

TRIEBER, District Judge (after stating the facts as above). [1] Counsel for the trustee, in their briefs and oral argument, contended that the findings of the referee, especially in view of the fact that some of the testimony was taken in his presence, a considerable part having been taken before another referee, who has since died, should be given the same effect as the verdict of the jury, and, if there is any substantial evidence to sustain his findings, the court should not set them aside. The rule thus stated is too broad. The correct rule is that the findings of fact made by a referee in bankruptcy are presumptively correct, and unless they are clearly against the weight of the evidence, or some obvious error of law has intervened in its application, will not be disturbed; but they are not conclusive, as is the verdict of a jury, or the findings of facts made by the judge in an action at law when a jury has been waived. This is the rule of law applicable to masters in chancery, and is equally applicable to findings made by a referee in bankruptcy. Southern Pine Co. v. Savannah Trust Co., 142 Fed. 802, 73 C. C. A. 60; Houck v. Christy, 152 Fed. 612, 614, 81 C. C. A. 602, 605; Ohio Valley Bank v. Mack, 163 Fed. 155, 158, 89 C. C. A. 605, 608, 24 L. R. A. (N. S.) 184.

This necessitates an examination of the voluminous evidence taken in the case, for the purpose of determining whether the findings of facts made by the referee are clearly against the weight of the evidence, or whether some obvious error of law has intervened in the conclusions reached. There is little conflict in the evidence, and the referee's findings are practically based entirely on his views of the law applicable to the issues involved. In the argument before the court, counsel presented their views on the whole case, and treated the case, and the court will treat it, as tried de novo, but giving the findings of facts made by the referee that weight to which they are entitled under the rule of law hereinbefore stated.

[2] It is claimed on behalf of the trustee that the composition agree-

ment entered into in August, 1899, whereby the Commission Company was to be paid in full, while the other creditors were to receive only 40 per cent. of the amounts of their respective claims, although the Commission Company signed the composition agreement, whereby it obligated itself to accept 40 per cent. of its claim, the same as the other creditors, was such a fraud as vitiates the entire indebtedness, or at least warrants an abatement of that much of its claim. The undisputed evidence shows that at the time this composition agreement was made the bankrupt did not have the money to pay the creditors the sum of money due them under the agreement; that he thereupon entered into an agreement with the Commission Company to the effect that, if it would advance the money needed to pay these debts, he would pay its debts in full. The Commission Company did not sign the composition agreement until all the other creditors had signed it. This agreement to pay the Commission Company's claim in full was not made known to the other creditors; but there is no evidence whatever to show that there was any fraudulent concealment, or any fraud practiced upon the other creditors, nor are any of these creditors making any objections now. Numerous authorities have been cited by counsel for the trustee that this agreement was a fraud on the other creditors; but in view of the late decision of the Supreme Court of the United States in Zavelo v. Reeves, 227 U. S. 625, 33 Sup. Ct. 365, 57 L. Ed. —— (opinion filed February 24, 1913), this contention cannot be sustained. In that case Mr. Justice Pitney, who delivered the unanimous opinion of the court, said:

"It is certain, however, that a discharge, while releasing the bankrupt from a legal liability to pay a debt that was provable in the bankruptcy, leaves him under a moral obligation that is sufficient to support that promise to pay the debt. And in reason, as well as by the great weight of authority, the date of the new promise is immaterial. The theory is that the discharge destroys the remedy, but not the indebtedness; that, generally speaking, it relates to the inception of the proceedings, and the transfer of the bankrupt's estate for the benefit of creditors takes effect at the same time; that the bankrupt becomes a free man from the time to which the discharge relates, and is as competent to bind himself by a promise to pay an antecedent obligation, which otherwise would not be actionable because of the discharge, as he is to enter into any new engagement. And so, under other bankrupt acts, it has been commonly held that a promise to pay a provable debt, notwithstanding the discharge, is as effective, when made after the filing of the petition and before the discharge, as if made after the discharge."

The facts in that case were that the defendant had been adjudicated a bankrupt; that subsequently he offered a composition to his creditors, and the offer was accepted, and a composition made in said proceedings and duly confirmed by the District Court; that the plaintiffs were then creditors of the bankrupt, and as such accepted the offer of composition and were paid a dividend thereon; that the claim sued on was a part of and was included in said claim on which the dividend was paid; that before the composition had been confirmed the defendant promised that, if plaintiff would lend him $500 for use in paying the consideration of the composition to his creditors in the bankruptcy proceedings, he would pay plaintiffs the balance of their claims in full. Plaintiffs accepted the offer and promise, loaned the bankrupt the mon-

ey, and accepted his notes for the balance due them on their claim after the payment of the composition, and upon nonpayment of the latter instituted action. It was held they were entitled to recover.

[3] It also appears that in August, 1899, at the time the composition aforementioned was entered into, the bankrupt executed a mortgage to the Commission Company on a lot of small value in the town of Reyno, Ark., and his stock of general merchandise in his store; also the fixtures in the store and some other personalty, including all notes, mortgages, and accounts due the bankrupt, for the purpose of securing the sum of $6,400, the amount then due the Commission Company, and also the money which it would be necessary to pay the creditors under the composition agreement. The mortgage also provided that any advances made by the Commission Company should bear interest at the rate of 8 per cent. per annum. The mortgage further provided that the possession of the property is surrendered at once to the Commission Company, and that the bankrupt is to act as its agent in gathering the crops mortgaged, and also in the sale of the merchandise; that he is to ship to the Commission Company all the cotton mortgaged as soon as it is picked, and the proceeds of sales of all merchandise and collections of the mortgaged accounts, and in case of failure to do so, or if he should purchase goods or supplies contrary to instructions or desire of the Commission Company, then the Commission Company shall have the right to take immediate possession of all the property mortgaged, including the merchandise, and sell the same for the purpose of paying its debt. It is now claimed that by reason of this mortgage the Commission Company was the real owner of the store, and therefore cannot be a creditor.

Under the laws of Arkansas, as construed by the Supreme Court of that state, a mortgage on a stock of merchandise, with permission to the mortgagor to remain in possession and sell them without accounting therefor to the mortgagee, is absolutely void, regardless of the intention of the parties. Lund v. Fletcher, 39 Ark. 325, 43 Am. Rep. 270; Martin v. Ogden, 41 Ark. 186; Fink v. Ehrman, 44 Ark. 310; Gauss v. Doyle, 46 Ark. 122; Collins v. Lightle, 50 Ark. 97, 6 S. W. 596; Stix v. Chaytor, 55 Ark. 116, 17 S. W. 707. On the other hand, it has also been held by the Supreme Court of Arkansas that a mortgage on a stock of merchandise, permitting the mortgagor to remain in possession, but requiring him to pay all moneys realized from the sale of the merchandise, less the expense of carrying on the business and the living expenses of the mortgagor, to the mortgagee, is valid. Adler-Goldman Com. Co. v. Phillips, 63 Ark. 40, 37 S. W. 297.

[4] All the above-cited cases were decided before the execution of this mortgage, and no doubt the attorney who prepared this mortgage had these decisions in view. The instrument, which was of record, showed on its face that it was only intended as a mortgage, and there is no evidence whatever to show that any of the creditors of the bankrupt, who extended him credit after the execution and recording of this mortgage, regarded the Commission Company as the owner, or having any interest in the business of the bankrupt, except as a mortgage creditor. If any of them had believed that the Commission Company was the owner of the store, or had any interest as a partner in

the concern, they would not have hesitated to extend all the credit that the bankrupt wanted, without any inquiry as to the financial standing of Hawks; for it appears clearly from the evidence that the Commission Company is not only solvent, but is a corporation of very large means and enjoying the very highest credit. Besides, if this contention of counsel for the trustee is correct, the Commission Company is now liable for the debts of the bankrupt.

[5] But, aside from this, the mortgage has long since ceased to be of any validity, and no claim whatever is made under it by the Commission Company. Under the rules of law governing appropriation of payments, the law, in the absence of any specific instructions·from the debtor, applies them to the oldest indebtedness first. Goldsmith v. Lewine, 70 Ark. 516, 69 S. W. 308; United States v. Kirkpatrick, 9 Wheat. 720, 6 L. Ed. 199; McGillin v. Bennett, 132 U. S. 445, 10 Sup. Ct. 122, 33 L. Ed. 422; Dunnington v. Kirk, 57 Ark. 595, 22 S. W. 430.

[6] The payments made by the bankrupt to the Commission Company in·1900 were more than sufficient to satisfy the indebtedness secured by the mortgage, which included the indebtedness arising from the composition agreement. Besides, the mortgage was due January 1, 1900, and would be barred five years from that date. Under the laws of the state of Arkansas, there can be no enforcement of a mortgage unless the suit is brought within the period of limitation prescribed for a suit on the debt secured thereby. Section 5399, Kirby's Digest of the Stat. of Arkansas. For this reason, the mortgage, if the debt intended to be secured by it had not been paid off before January 1, 1905, would cease to be of any validity on that day, being barred by the laws of the state of Arkansas.

[7] The claim that the Commission Company had no right to charge a higher rate of interest than 6 per cent. per annum, in the absence of a written agreement to that effect, and to compound the interest annually, is disposed of by the fact that the evidence shows that on the 1st day of September of every year the Commission Company sent an itemized statement of all the dealings between the parties during that year, which showed that the bankrupt was charged with interest at the rate of 8 per cent., and that the same was compounded annually. No objections were made by the bankrupt at any time, and they thereupon became accounts stated, the effect of which is that they became settled accounts, and liquidated by the parties as fully as if they had been signed by both parties. Standard Oil Company v. Van Etten, 107 U. S. 325, 1 Sup. Ct. 178, 27 L. Ed. 319; Bank v. Morgan, 117 U. S. 96, 6 Sup. Ct. 657, 29 L. Ed. 811; Allen-West Commission Company v. Patillo, 90 Fed. 628, 33 C. C. A. 194; Patillo v. Allen-West Commission Company, 131 Fed. 680, 65 C. C. A. 508.

This leaves for determination the main question in issue—whether the evidence establishes fraud on the part of the Commission Company, in aiding the bankrupt to fraudulently obtain credit for the purchase of merchandise, whereby the Commission Company would finally be benefited in the collection of the indebtedness due it.

[8] There are certain well-settled rules of law to guide the courts

in the determination of such an issue. If the circumstances proven are just as consistent with honesty and good faith as with a fraudulent intent, the inference of fraud is unwarranted. United States Fid. & Guar. Co. v. Des Moines Nat. Bank, 145 Fed. 273, 74 C. C. A. 553. To establish fraud, the proof must be clear, unequivocal, and convincing. Jones v. Simpson, 116 U. S. 609, 6 Sup. Ct. 538, 29 L. Ed. 742; Thorwegan v. King, 111 U. S. 549, 4 Sup. Ct. 529, 28 L. Ed. 514; Farrar v. Churchill, 135 U. S. 609, 10 Sup. Ct. 771, 34 L. Ed. 246; Walker v. Collins, 59 Fed. 70, 8 C. C. A. 1; Foster v. McAlester, 114 Fed. 145, 52 C. C. A. 107; Schagun v. Scott Mfg. Co., 162 Fed. 209, 89 C. C. A. 189. Proofs which only create a suspicion are not sufficient to warrant a finding of fraud. United States v. Hancock, 133 U. S. 193, 10 Sup. Ct. 264, 33 L. Ed. 601; United States Fid. & Guar. Co. v. Des Moines Nat. Bank, supra. A mere preponderance of evidence, which at the same time is vague or ambiguous, is not sufficient to warrant a finding of fraud. Lalone v. United States, 164 U. S. 255, 17 Sup. Ct. 74, 41 L. Ed. 425.

[9] But it is not essential that the fraud be established by direct evidence; for that is often impossible. The circumstances proved may raise a sufficient presumption to warrant a finding of fraud; but in such cases the evidence must be of such a nature as to be convincing and inconsistent with the presumption of honesty. Bank of Little Rock v. Frank, 63 Ark. 16, 37 S. W. 400, 58 Am. St. Rep. 65.

[10] As proceedings in bankruptcy are governed by the rules of courts of equity, the court must disregard mere matters of form, and ascertain the ultimate relation and liability of the several parties, and base its judgment thereon. It must look through forms and appearances to ascertain the true nature of the act. In re Siegel-Hillman D. G. Co. (D. C.) 111 Fed. 981, 986; In re Arnold & Co. (D. C.) 133 Fed. 789, 791. That the bankrupt was insolvent must have been known to the Commission Company at least as early as 1905. The evidence shows that the indebtedness to it from the bankrupt grew steadily from September 1, 1900, when it amounted to $7,730, to the time of the bankruptcy, when it amounted to over $254,000. The proof shows that the indebtedness on September 1st of each year, commencing with 1900, was as follows: (1900, $7,730; 1901, $53,624.58; 1902, $61,733.07; 1903, $63,337.17; 1904, $83,655.57; 1905, $98,117.17; 1906, $105,283.58; 1907, $134,041.96; 1908, $148,560; 1909, $176,714.48; 1910, $202,242.43.

[11] It is true that during this time the assets of the bankrupt increased steadily. Starting in with one store, he opened additional stores at different places, until he had five stores. He also had bought a steam gin and invested considerable in real estate. But the liability to the Commission Company increased much more rapidly than his assets, and in view of the fact that the Commission Company also acted as the banker of the bankrupt, all drafts being drawn on it, not only for the purchase of cotton, but in payment of merchandise debts, and in view of the correspondence between the parties during all that time, it is impossible to reach any other conclusion than that, not later than 1905, the Commission Company must have known that he was then

insolvent. But mere knowledge of insolvency of a debtor is not sufficient to charge a creditor with a fraudulent intent in an action of this nature, which must be treated as if an action for deceit.

The voluminous correspondence between the parties, and the letters written by the Commission Company, it is claimed, establish conclusively that it was the intention of the Commission Company "to boost" the credit of the bankrupt, so as to enable him to procure, not only all of the merchandise he needed in his business, but as much more as possible, on credit. A careful reading of these letters does not satisfy the court that that was the intention of the Commission Company. They rather indicate that the Commission Company, having become a large creditor, was hopeful that a few profitable seasons would enable the bankrupt to pay his debts, and that its only chance to recover its money was by helping him along, assisting him with money, until good crops for a number of years in the section where the bankrupt was engaged in business, and good prices for the cotton, which is the staple crop raised in that section, would enable him to pay all of his debts, including that due the Commission Company. In almost every letter written by the Commission Company, it urges him to economize. It protests against his branching out and opening new stores, and insists upon a reduction of its indebtedness. In a letter dated March 22, 1909, the Commission Company wrote him:

"Try to get out instead of deeper in debt. You will probably never have another year with as favorable crops as you had this past year, and we think your account should show a considerable reduction; but it does not. We have always insisted upon you cutting down expenses, and doing less business on a safer and more profitable basis. Do business for profit, and not for show. * * * The difficulty is that you get in debt to these other people, and then draw on us to pay them, which, of course, increases your indebtedness with us. Now, you must not expect us to do this; if you do, we are afraid you are to be disappointed. Because we have been your friends, and have not placed an iron rule on you, as the Memphis people claim they do, you should show your appreciation by trying to reduce your indebtedness to us, instead of riding us to death."

In almost every letter he is urged to reduce his indebtedness and go less in debt to others. There is nothing in any of these letters to indicate an intention to aid the bankrupt to perpetrate a fraud on any one; but they seem to contain such advice as a creditor to whom a large sum of money is due, and whose experience in business is much greater than that of the debtor, would give. Some of the letters read as if written by a parent, interested in his son's welfare. Nor is there any evidence whatever tending to show that the bankrupt purchased any goods, except such as were needed in his business; none of his property was fraudulently disposed of, nor any of his assets concealed by him. The most that can be said of this correspondence is that it is a circumstance which should be considered with other testimony, and thus may establish fraud.

It is claimed that other matters justifying the finding of fraud are the failure of the Commission Company to advise creditors of the bankrupt or merchants to whom the bankrupt had applied for credit, and who made inquiry of it as to his financial condition, the amount of his indebtedness to it, and in other instances making willfully false

statements. In one of its letters to the bankrupt, Mr. Allen, president and general manager of the Commission Company, who it seems attended to this correspondence, wrote the bankrupt under date of October 19, 1910:

"People are coming down here to see us about you all of the time. We are doing all that we can to help you, by telling the truth about what we do tell."

In the same letter he continues:

"As you know, we have always been opposed to your spreading out so much, and trying to do so much, especially since you have no capital to do it on. * * * Do not unload everything on us, as you have been doing in the past. That is not right and just for you or for us."

The statement that "people are coming down here to see us about you all of the time" was evidently to stir him up, and was a mere figure of speech, as Mr. Allen in his evidence testified that only very few inquiries were made, and the trustee has only been able to find three parties who made such inquiry, and one instance in 1903, when the Dun Commercial Agency made inquiry of the Commission Company as to the bankrupt's financial condition by showing the statement made by the bankrupt. One letter of inquiry was received in 1901 from the Bray Clothing Company, to which Mr. Allen replied:

"We do not think you would run any risk in filling this bill for Mr. Hawks; but you must be your own judge of credits, as we never profess to judge credits for other people, and we would rather you would use your own source of information, like we do, instead of referring to us."

There is nothing to show that at that time he did not really believe this to be true, or that he believed Hawks to be insolvent at that time. The bill of the Bray Clothing Company, if credit was extended to the bankrupt upon the strength of this letter, was evidently paid promptly and this creditor is not complaining, nor is there any evidence that it was a creditor of the bankrupt at the time of the adjudication.

Another inquiry was made by W. M. Ball & Co. in 1909; and, while the answer thereto did not state the indebtedness due the Commission Company, it was evidently of such a nature as to cause Ball & Co. to decline taking the account of the bankrupt and extending to him the credit he desired.

The third inquiry was made by a Mr. Phillips, a representative of a concern selling gins; and, although he was not informed of the amount due the Commission Company, he declined to extend credit to the bankrupt. Nor was the statement to the Dun's Commercial Agency in 1903 of such a nature as to justify a finding that it was knowingly false and made with the intention of deceiving any one. Hawks had made a statement to the Commercial Agency that his net worth was $40,000, and when inquiry was made of Mr. Allen he stated that he did not think Hawks was worth more than half that sum. There is no evidence to warrant the finding that Mr. Allen did not believe that statement to be true at the time he made it.

[12] The failure or refusal of one creditor to inform others of the indebtedness due him from a common debtor is not evidence of fraud. He has the right to refuse the information. This identical question was before the Circuit Court of Appeals for this circuit in Foster v.

McAlester, supra, where Judge Caldwell, delivering the opinion of the court, held:

"Merchants and business men are not required to answer general letters of inquiry regarding the credit, promptness, and financial standing of a named person, or to disclose their business relations or the state of their account with such persons."

In fact, the evidence does not satisfy the court that Hawks did not at that time believe his statement to be true. It seems that he had a large amount of unsold cotton in the hands of the Commission Company at that time, and his indebtedness to it depended to a large extent on the price for which the cotton would sell, which price is always uncertain, as it depends upon the fluctuations of the market, which are, at times, quite violent.

Another important fact entitled to consideration is that none of the present creditors of the bankrupt ever inquired of the Commission Company as to the bankrupt's financial standing or his indebtedness to the company. Although a number of credit men of these creditors testified in this case, none of them testified that such inquiry was ever made of the Commission Company. They seemed to rely solely upon the rating given by the mercantile agencies, which it is not claimed was based upon any information obtained from the Commission Company after 1903, and the further fact that Hawks paid his bills promptly by drawing his drafts on the Commission Company.

[13] Great stress is also laid upon a letter from the Commission Company to Hawks, dated July 7, 1903, in which it suggested to Hawks, who had previously written that he was willing to turn over all his property whenever he was requested, as it had furnished him the money with which to purchase it, a form of letter which he should write. In this letter Hawks was to agree to turn over all his crops, farming implements, stock, horses, mules, and gin, all of which had been bought with the money of the Commission Company, whenever it was desired for the protection of its interests. A similar attack was made upon a mortgage in Foster v. McAlester, supra, and it was held:

"The understanding that Terrell & Co., when required to do so, would give the plaintiff a mortgage on the goods in the Indian Territory, did not of itself render the mortgage fraudulent and void in law. As bona fide creditors of Terrell & Co. they had the right at all times, independent of any previous understanding to that effect, to demand of Terrell & Co. such security for their debt, and Terrell & Co. had an undoubted right to give it. This being the unquestioned legal right of the parties, upon what principle can it be said to be a legal fraud, or a badge of fraud, for the parties to stipulate for doing that which they would be perfectly free to do, and which would be perfectly legal for them to do, independent of such stipulation? Why should a mortgage, which the creditor had a legal right to demand and the debtor a legal right to give, be held void because the debtor had previously agreed that such security would be given when demanded? There is no such rule of law. It is an everyday practice for debtors to promise to give their creditors security when demanded, and while such promise affords slight protection to the creditors, and cannot be specifically enforced, when it is voluntarily complied with, the security is not to become invalidated."

[14] In 1909 the bankrupt executed a mortgage on some of his real estate to secure his entire indebtedness to the Commission Company; but the mortgage failed to designate the amount of the debt due it

This it is claimed vitiated the mortgage, and in any event is a strong badge of fraud. It is sufficient to say that such mortgages have always been upheld, and especially is this the rule of law in the state of Arkansas. Jarratt v. McDaniel, 32 Ark. 598; Curtis v. Flinn, 46 Ark. 70; Moore v. Terry, 66 Ark. 393, 50 S. W. 998; Hoye v. Burfc⁻ᴵ 68 Ark. 256, 57 S. W. 795. In Curtis v. Flinn it was held:

"If a mortgage contains a general description sufficient to embrace the liability intended to be secured, and to put the person examining the record upon inquiry, and to direct him to the proper source for more minute and particular information of the amount of the incumbrance, it is all that fair dealing and the authorities demand." ..

The authorities relied upon by counsel for trustee are: In re Rieger (D. C.) 157 Fed. 609; In re Friedman (D. C.) 164 Fed. 131; In re Kyte (D. C.) 182 Fed. 166. The facts in these cases differ so much from the case at bar that they have no application here. Upon the facts found in these cases, the conclusions reached were undoubtedly correct; and, were the facts in the instant case similar, this court would unhesitatingly follow them.

In the Rieger Case there was a partnership between the creditor and the bankrupt, and the court properly held that the corporation, being a partner, is not entitled to prove its claim.

In the Friedman Case the court found the facts to be that the bankrupt deliberately started out to conceal his insolvency, which he knew to be a fact at the time, and to obtain goods from wholesale houses without intending to pay for same; that he bought goods on credit wherever he could obtain them, in quantities largely in excess of what he could dispose of in his business; that he sold a great many of them at wholesale; that no entries were made on the books, nor was the money paid over to the cashier, but was fraudulently appropriated by him; that some of the goods were never taken to the store of the bankrupt, but were carried in their original packages to the parties who filed these claims against the bankrupt; that according to the books there should have been on hand $81,000 worth of merchandise when he was adjudicated a bankrupt, but instead there was only $38,000 worth on hand, and no explanation was made of this deficit; that during the last six months of his business he purchased $69,000 worth of goods, while for the entire previous year he only purchased $50,000 worth; that the money, which it was claimed he had borrowed from these creditors, all of whom were his relatives or intimate friends, never reached the bankrupt's business, and the bankrupt was unable to give any explanation of that fact; that the creditors had been intimate associates with the bankrupt for many years; that when he started into business he was doing so on borrowed capital, as was well known to them, and when they made these loans they were doing business largely on borrowed capital; that they made the loans without security, although they knew that he was insolvent; that to secure the money to make these loans they hypothecated insurance policies, and one of the creditors mortgaged his homestead for the purpose of making the loan; that when the goods were sold by the trustee they were purchased by a brother-in-law of the bankrupt for the benefit of the bankrupt and these claimants. The evidence in that case conclu-

sively established a conspiracy between these creditors and the bankrupt to defraud the other creditors, and the court properly held that they were not entitled to have their claims allowed.

In the case at bar none of these facts existed. The bankrupt made no purchases of goods, except as they were needed in his several stores. No moneys were misappropriated by him. None of the goods bought were sold in any other than the usual manner. None of his assets are shown to have been concealed. None of the officers of the Commission Company were in any wise related to the bankrupt, or on such terms of intimacy as to arouse even a suspicion of a desire to aid him in the perpetration of a fraud. The Commission Company is financially one of the strongest mercantile corporations in the city of St. Louis. Not the slightest suspicion is cast by any of the voluminous testimony in the case upon its integrity or standing in the commercial world. The only charge that is established by the evidence is that it displayed poor business judgment in permitting its claim to become so large, instead of closing the matter up and making the loss before the debt had grown to these enormous proportions. As it is, its loss now will be much greater than if it had lost its entire debt at any time prior to 1906.

In the Kyte Case the bankrupt owned a building subject to a mechanic's lien amounting to over $2,000. The lien claimants were indebted to him in the sum of nearly $1,800. His two sons, who clerked for him and knew his financial extremity, a few days before the execution of an assignment for the benefit of his creditors, purchased the mechanic's lien, and with this money the lien claimants paid the bankrupt the back accounts. They failed to show how they obtained the money to purchase these claims, and it was a reasonable presumption that it had been furnished by their father, the bankrupt, as they had no means of their own. Upon these facts the court properly held that these liens were not valid in the hands of his sons as against the claims of the general creditors.

From a careful examination of the entire evidence, the court is of the opinion that the findings of the referee were reached from erroneous conclusions of law applicable to a case of this nature, and that the evidence does not justify a finding that the Commission Company was guilty of any conspiracy or any fraud which would warrant the court to refuse the allowance of its claim, or postpone it until after the other creditors have been paid, which would, in effect, be the same as a disallowance.

The order of the referee disallowing the claim will be set aside, with directions to allow the claim as an unsecured claim, after deducting therefrom the money realized from the sale of the real estate covered by the mortgage of 1909, now in the registry of the court, and that it is entitled to the money realized from the sale of the mortgaged premises, that being a preferred claim.